## RAWLINS *et al. v.* THE STATE.

## TURNER *v.* THE STATE.

1. The board of jury commissioners may, in the exercise of their discretion, omit from the jury list of the county all persons who are exempted by law from jury service, as well as those whose business or avocation is such that it is reasonably probable that an excuse from jury service would be granted by the judge.
2. In the determination of whether the venue of a criminal case shall be changed for the reason that the condition of the public mind is such that the accused can not obtain a fair trial by an impartial jury, the law imposes upon a trial judge the responsibility of making an examination and informing himself of the truth of the averments upon which the application is made; and the Supreme Court has no power to control his discretion in such a matter, unless it has been plainly and manifestly abused. The record does not disclose any such abuse of discretion in the present case.
3. Principals and accessories before the fact may be charged in the same indictment and in one count.
4. An indictment which charges that one, being absent at the time when the crime was committed, did "procure, counsel, and command" the persons alleged as principals in the crime to commit the same, contains a sufficient charge against one indicted as an accessory before the fact.
5. The indictment was not subject to any of the objections set forth in any of the demurrers.
6. When a motion for a continuance is made upon the ground of the absence of witnesses, and the court postpones the case until the following

day, and notifies counsel that officers will be furnished to bring into court the absent witnesses, and such officers are furnished, and all the witnesses desired are brought into court, and there is no further motion for a continuance, a ground of a motion for a new trial complaining of the refusal to continue on the day the case was first called is without merit.

7. The failure of the court to interpose of its own motion, in case of disorder by the spectators at the trial, will not generally be a sufficient reason to reverse the judgment, when no ruling in reference to the disorder was invoked from the court.

8. That the accused, who was jointly indicted with others, was jointly arraigned with the others, after he had elected to sever upon the trial, furnishes no reason for granting a new trial, after a separate trial has been accorded to him.

9. The action of the sheriff in making the statement to the judge in the presence of the jury that the mother of the accused had requested her satchel to be brought into court, and that the satchel contained a pistol, was reprehensible as to the manner in which the fact was communicated to the judge. As it appeared from a statement of counsel for the accused that the pistol was in the satchel solely for the reason that the mother of the accused and her two daughters had been traveling through the country, and that it was carried for protection only, and was not in the satchel nor brought into court for any improper purpose, and as evidence was introduced to the same effect, and the truth of the statement and the evidence was admitted by the solicitor-general, and the jury were instructed not to allow the incident to have any effect upon their minds in determining upon their verdict, a refusal to declare a mistrial on account of the conduct of the sheriff was properly overruled.

10. The fact that a confession is brought about by improper and unlawful methods from one alleged to be concerned in the commission of the crime is no reason for refusing to allow such person to testify as a witness on the trial of his associates in the criminal enterprise. The circumstances under which the confession was made, and any evidence tending to show that the witness is still laboring under fears brought about by such circumstances, ·is admissible to discredit the witness, but the witness is nevertheless competent.

11. In the trial of a murder case, evidence tending to show a state of bad feeling between the father of the accused and the father of the deceased is admissible for such weight as a jury may see fit to give it in determining whether the accused had a motive in becoming one of a party of assassins to slay the father of the deceased and other members of his family; and this is true although the father escaped assassination and only two of his children were slain.

12. When in the trial of a murder case there is evidence tending to show that the accused on trial entered into a conspiracy to slay the deceased and others, the acts, conduct, and sayings of any of the conspirators while the conspiracy was in progress, and before the crime was committed, are admissible as evidence, as well as an act of a conspirator other than the accused, after the commission of the crime, when the act sought to be proved was contemplated by the terms of the conspiracy to be performed after the perpetration of the crime was completed.

13. Errors in the admission of evidence, made during the progress of a trial, may be corrected by the judge withdrawing the evidence from the consideration of the jury and instructing them not to consider it; and errors in his charge may be corrected by the judge calling attention to the erroneous part of the charge, and in lieu thereof giving to the jury the correct rule.

14. Challenge to the array is not the proper method of raising the question of the disqualification of individual jurors.

15. When two are tried jointly for a capital offense, and neither waives his peremptory challenges, the State is entitled to one half of the whole number of challenges the law allows to both.

16. A portion of a charge that is substantially correct, wherein a complete proposition is stated, is not erroneous simply because it fails to embrace an instruction which would have been appropriate in connection with that proposition.

17. Where counsel in argument makes improper statements, counsel for the injured party may move either for an appropriate instruction to the jury or for a mistrial. Where counsel ask simply for such an instruction which is given, and the case ordered to proceed, a motion for a mistrial, then made upon the same ground, should not generally be entertained.

18. Where a motion is made to continue a criminal case upon the ground that the accused is physically unable to go to trial, and upon such question the testimony introduced is conflicting, the discretion of the trial judge in overruling the motion will not be controlled.

19. A motion for continuance on account of the illness of counsel, like all other motions of the same nature, is addressed to the sound discretion of the trial judge. When counsel whose illness is the ground of the motion is himself in court presenting and urging the motion, the court is authorized, in the determination of the question whether the condition of counsel is such that the interests of justice demand a postponement of the case, to take into consideration the general appearance of counsel and the mental and physical vigor displayed in the presentation of the motion; and when such a motion is overruled, this court may take into consideration what appears in the record as to the manner in which counsel conducted the case, in determining whether there has been such an abuse of discretion in refusing the continuance as to require a reversal of the judgment. In the present case it does not appear there was any abuse of discretion in refusing to continue the case.

20. In the trial of one charged as an accessory, it is incumbent upon the State to show the guilt of the person charged as a principal, beyond a reasonable doubt; and, as a general rule, in order to establish this fact any evidence may be introduced which would be admissible if the principal were on trial.

21. In the trial of one who is charged as an accessory before the fact to a murder, when it appears that the deceased were killed during the night, as they emerged from the home of their father, by persons who had surrounded the house, evidence that the accused had made threats to slay the father and had offered persons money to kill him, was admissible.

22. It is lawful to receive a verdict in a criminal case on Sunday.

3

23. The evidence as to those who were charged as principals was sufficient to authorize the verdicts rendered against them.

24. The evidence as to the accused charged as accessory before the fact, who was the father of three of the persons charged as principals, was sufficient to authorize the verdict.

25. The evidence against the other accused charged as an accessory before the fact was not sufficient to authorize the verdict, and the court erred in not granting him a new trial.

Argued October 17,—Decided November 8, 1905.

Indictments for murder. Before Judge Mitchell. Lowndes superior court. September 9, 11, 1905.

Milton, Jesse, Leonard, and J. G. Rawlins were arrested for the offense of murder, and were committed to jail. A special term of the court was called for the disposition of their cases. When the grand jury was organized, and before any indictment was preferred, each of the accused filed a written challenge to the array, upon the ground that the grand jury was not legally organized. The objection was that the jury commissioners had arbitrarily excluded from the grand jury all lawyers, ministers, doctors, dentists, railroad engineers and firemen, there being ten or other large number of each class in the county, who were citizens and residents, and possessed the qualifications required by law for grand jurors, and there being upon neither the grand-jury list nor in the grand-jury box any member of any of such classes. It was contended that the arbitrary exclusion of all of these classes without reference to their qualifications was a violation of the statute and constitution of this State, and especially that provision of the constitution which grants to every one due process of law, and that it was also in violation of the fourteenth amendment to the constitution of the United States, as well as of other provisions of that instrument, and had the effect to deny to the accused due process of law, as well as equal protection of the law, and abridged their privileges and immunities as citizens of the United States. On demurrer this challenge was stricken, and the grand jury ordered to retire and enter upon a consideration of the cases. The accused excepted. The grand jury returned an indictment of which the following is a copy:

"Georgia, Lowndes County. In the Superior Court of said county. The grand jurors selected, chosen, and sworn for the county of Lowndes, to wit: . . in the name and behalf of the citizens of Georgia, charge and accuse Milton Rawlins, Leonard Rawlins,

Jesse Rawlins, and Alf Moore, of the State and county aforesaid, with the offense of murder, and J. G. Rawlins and Frank Turner, of the county and State aforesaid, with the offense of accessory before the fact to said murder; for that the said Milton Rawlins, Leonard Rawlins, Jesse Rawlins, and Alf Moore, being persons of sound memory and discretion, on the 13th day of June, in the year of our Lord, 1905, in the county aforesaid, with force and arms, one Willie Carter and one Carrie Carter, in the peace of God and said State then and there being, then and there unlawfully, feloniously, wilfully, and of their malice aforethought, did kill and murder by shooting the said Willie Carter and the said Carrie Carter with certain guns, which the said Milton Rawlins, Leonard Rawlins, Jesse Rawlins and Alf Moore then and there had, and giving to the said Willie Carter and Carrie Carter then and there mortal wounds, of which mortal wounds the said Willie Carter and the said Carrie Carter died; and for that the said J. G. Rawlins and Frank Turner, being absent at the time of the commission of the crime aforesaid, in manner and form aforesaid, by the said Milton Rawlins, Leonard Rawlins, Jesse Rawlins, and Alf Moore, did yet, then and there unlawfully, feloniously, wilfully, and of their malice aforethought procure, counsel, and command the said Milton Rawlins, Leonard Rawlins, Jesse Rawlins, and Alf Moore to commit the crime of murder aforesaid. And the jurors aforesaid upon their oaths aforesaid do say that the said Milton Rawlins, Leonard Rawlins, Jesse Rawlins, and Alf Moore then the said Willie Carter and Carrie Carter in manner and form aforesaid unlawfully, feloniously, wilfully, and of their malice aforethought did kill and murder, and that the said J. G. Rawlins and Frank Turner, being absent at the time of the commission of said crime of murder, did then and there unlawfully, feloniously, wilfully, and of their malice aforethought procure, counsel, and command the said Milton Rawlins, Leonard Rawlins, Jesse Rawlins, and Alf Moore to commit the said crime in manner and form aforesaid, contrary to the laws of said State, the good order, peace, and dignity thereof.

> "W. E. THOMAS, solicitor-general.
> "W. L. CARTER, prosecutor."

Each of the Rawlinses filed a written motion for a change of venue, alleging, that the special term of the court had been called solely for the purpose of trying the accused; that as this was done

in response to a call from the people of the county, that fact alone was sufficient evidence that the condition of the public mind in the county was such that they could not get a fair and impartial trial before a jury in that county; that on account of the wide publicity of the case, the false rumors that had gone out, the high feeling and excitement, on account of which the special term had been called within little more than thirty days from the commission of the crime, which was of an atrocious nature, it would be impossible to obtain a legal trial under such' circumstances; that a large portion of the jurors had formed and expressed opinions as to the guilt of the accused, either from evidence that had been heard or statements that had been made in regard to the crime; that evil-disposed persons had circulated rumors exceedingly damaging to the accused; and that the condition of the public mind was such that it was impossible for the jury to hear the evidence and arrive at a verdict in the manner which the constitution and the law required. Upon this motion the court heard evidence, and, after a consideration of the evidence, overruled the motions for a change of venue; and each of the defendants excepted.

Each of the Rawlinses filed a general demurrer to the indictment, and also a special demurrer upon the following grounds: The indictment does not charge any overt act that J. G. Rawlins did to make him an accessory before the fact; the indictment does not charge with sufficient particularity the facts alleged to have been committed, so as to put the accused on notice of the particular crime that each is charged with; the indictment does not charge with sufficient particularity the instrument with which the killing was done, simply charging that it was done with certain guns; the indictment does not allege which one of the accused killed Willie Carter and which one killed Carrie Carter; the indictment charges the principals and accessories before the fact in the same count, and in the same indictment. J. G. Rawlins also demurred upon the ground that the indictment did not charge the trial and conviction of the principals in the first degree, or set up the record of the trial, or that the parties were unknown. Turner also filed a general demurrer to the indictment, as well as a special demurrer upon the ground that it did not charge any overt act on his part to make him an accessory before the fact. All of the demurrers were overruled, and each of the accused excepted. Each of the

Rawlinses then filed a challenge to the array of the jury empaneled to try them, upon the same grounds upon which they had challenged the grand jury. These challenges were overruled, and each excepted. Leonard and Jesse Rawlins were tried jointly, the others were tried separately. Milton, Jesse, J. G. Rawlins, and Alf Moore were found guilty, and sentenced to be hanged. Leonard Rawlins and Turner were found guilty, and sentenced to the penitentiary for life. Each of the Rawlinses and Turner filed motions for a new trial, which being overruled, each excepted.

*John R. Cooper* and *O. M. Smith,* for Rawlins et al.

*A. J. Little, S. M. Varnedoe,* and *O. M. Smith,* for Turner.

*John C. Hart, attorney-general,* and *W. E. Thomas, solicitor-general,* for the State.

COBB, P. J. 1. The constitution declares that "The General Assembly shall provide by law for the selection of the most experienced, intelligent, and upright men to serve as grand jurors, and intelligent and upright men to serve as traverse jurors. Nevertheless, the grand jurors shall be competent to serve as traverse jurors." Civil Code, § 5877; Penal Code, § 851. The General Assembly has provided that the selection of jurors shall be made by a board of jury commissioners composed of six discreet persons appointed by the judge of the superior court in each county. Penal Code, § 813. Upon these commissioners devolves the duty of revising the jury-list at the time required by law. In this revision they are limited to the names appearing upon the books of the tax-receiver of the county, and they are authorized and required to select, from the names there appearing, "upright and intelligent men to serve as jurors." From the number so selected they are required to select not exceeding two fifths "of the most experienced, intelligent, and upright men to serve as grand jurors." "The entire number first selected, including those afterwards selected as grand jurors, shall constitute the body of traverse jurors for the county." Penal Code, § 818. The constitution does not require that all upright and intelligent men shall be selected as jurors. If it were otherwise, the law which limits the jury commissioners to names appearing upon the tax digest, as well as the law which declares that certain county officers shall not be selected as jurors, would be invalid. The constitution merely fixes the qualifications of a juror,

and leaves to the General Assembly the question as to whether all of those persons or a lesser number shall be selected. The law passed by the General Assembly for the purpose of carrying into effect the constitutional provision does not require that all persons possessing the constitutional qualifications shall be selected. It reposes in the jury commissioners not only the authority to determine what men have these qualifications, but how many of such men shall be selected for jury duty in the county. The jury commissioners may select all belonging to this class, or they may select a lesser number. The jury-list of the county is not to be made up of any given number, but this is a matter left to the discretion of the jury commissioners. The number of persons selected for jury service is to be determined by the jury commissioners in the exercise of a wise discretion, taking into consideration the whole number of persons liable to jury service, the volume of business to be transacted in the various courts which require the presence of jurors, as well as the facilitation of business in such courts. They should keep in mind on the one hand the rights of those entitled to a jury trial, whether in civil or criminal cases, and on the other hand the rights of those who are subject to jury duty, making the list embrace such a number as will enable the courts to be carried on according to the spirit of the constitution and the law, and at the same time not making the number so small that jury service would become burdensome upon those selected for that duty. One placed upon the jury-list by the commissioners is, so far as jury service is concerned, declared to be intelligent and upright. But the fact that a person's name is not upon the jury-list of the county is no evidence that he is not intelligent and upright, nor that the commissioners did not consider him as such. The constitution fixes the class subject to this duty. The jury commissioners, under the authority of the General Assembly, select those members of that class who shall be called upon to perform the duty. The jury commissioners should not omit from the jury-list persons possessing the qualifications required by law, unless in their opinion the omission of such persons as a class would tend to facilitate the business of the courts. Persons possessing the qualifications required by law should not be excluded because they form a class of persons holding to a particular religious belief, or belong to a particular political party or society, or because they entertain views on any matter, not affecting the good

order of the community or the preservation of the public morals, different from the larger number of the community in which they live. But if there is a class of persons, some of whom possess the qualifications required and others do not, whose business or avocation is such that they are all entitled under the law to claim an exemption from jury service, or who would probably be excused from jury service on application to the judge, the omission of the entire class from the jury-list would not be an abuse of discretion on the part of the commissioners, such exclusion being calculated to facilitate the business of the court and avoid the delay incident to the summoning of jurors to take the place of jurors excused from service. All of the classes that were alleged to have been excluded from the jury-box in the present case belonged to either one or the other of the classes above referred to. They were either exempt, or their business was of such a character that it was reasonably certain that the judge would excuse them from service. There was no averment in the challenge that the exclusion was due to fraud or any improper motive. There was no suggestion that either the grand or traverse jurors drawn for service did not possess the qualifications required by law. There was no objection to any of the jurors that were on either list. The sole objection was that the list was deficient in number. In Daniel O'Connell's case (11 Cl. & Fin. 155, s. c. 1 Cox, C. C. 394) the jury was selected under an act requiring that the names of *all* persons possessing the qualifications required by law should be selected; and still a challenge to the array, that the jurors had been illegally and fraudulently selected for the purpose of prejudicing the parties upon trial, was stricken on demurrer, and this ruling was affirmed by a full court on the motion for a new trial, and finally affirmed by the House of Lords; though Lord Denman and Lord Campbell were of the contrary opinion. Thompson & Merriam on Juries, §140. While this ruling does not commend itself, at the same time we think it clear that where the law reposes in a body of public officers the selection of persons of given qualifications for service as jurors, and there is no charge of fraud or purpose to prejudice the rights of the parties on trial, and no objection to any of the jurors thus selected, a challenge to the array should not be sustained merely for the reason that there were other jurors possessing the qualifications required who might have been added to the list if the commissioners had seen proper to in--

clude them.   In People v. Jewett, 3 Wend. 314, the accused and
others were indicted for the offense of conspiracy to abduct William
Morgan.   It was alleged that the conspirators acted with the
Masons, whose secrets Morgan disclosed.   A challenge to the array
of the jurors was made upon the ground that the supervisors whose
duty it was to select the jurors had excluded from the list all per-
sons who were Masons, and had included therein many persons who
were anti-masonic in their feelings.   The qualifications fixed by
law for jurors were that they should be possessed of certain property
qualifications, should be men of integrity, fair character, sound
judgment, and well informed.   There was no complaint that any
of the men selected failed of these qualifications.   While Chief
Justice Savage expressed in his opinion his condemnation of the ex-
clusion of any set of men on account of their belonging to an asso-
ciation or fraternity, it was held that the challenge to the array was
properly overruled.   The Chief Justice in his opinion said: "Whilst
those who are selected are unexceptionable, the fact that others
equally unexceptionable are excluded is no cause of challenge of the
array.   A challenge can be supported only by showing that the per-
sons selected are not qualified according to the requirements of the
statute."

. There was nothing in the action of the jury commissioners com-
plained of which was in violation of any provision of the constitu-
tion or any statute of this State, nor is there anything in the statute
providing for the creation of the board of jury commissioners and
prescribing its duty which could be held a denial of due process of
law, or of the equal protection of the laws, or an abridgment of the
privileges and immunities of a citizen, within the meaning of the
different provisions of the constitution of the United States.

2. The constitution requires that one charged with crime shall
be tried in the county where the offense was committed, unless the
judge is satisfied that an impartial jury can not be obtained in that
county.   Penal Code, §29.   When the judge is so satisfied, he is
authorized to change the venue of the trial.   In determining this
question he is authorized to hear evidence in order to throw light on
the condition of the public mind, as well as to take into considera-
tion what may fall under his observation as the presiding judge of
the court.   The matter is of necessity left by the law largely to his
discretion.   No one could be better endowed with this power than

a fearless and conscientious judge who is present in the county, and can observe the manner and conduct of the people, and can hear the testimony of those witnesses who may be called by the accused and those called by the State, as well as the testimony of any witness he may see fit of his own motion to bring before him.   While under the law this court has the right to review a judgment overruling a motion to change the venue, such a judgment will never be overruled unless it is manifest from the record that the discretion vested in the judge has been abused, and as a result the accused has been forced to trial in a county where it was impossible for him to obtain a fair trial before an impartial jury.   The judge in the present case heard evidence, and no doubt took into consideration as well those things which fell under his observation not detailed in the evidence, and which of necessity could not be detailed, and, after consideration of the motion, overruled the same.    See *White* v. *State,* 100 *Ga.* 659(1).

3. The general rule is that an accessory before the fact can not be tried until after the conviction of the principal, but this does not prevent the indictment of the principal and the accessory before the fact at the same term of the grand jury and in the same bill. *Stone* v. *State,* 118 *Ga.* 707.   It is also permissible to embrace the accusation against the accessory before the fact in the same count in which the principal is charged.   *Bishop* v. *State,* 118 *Ga.* 799.   When so indicted, of course it is not necessary to allege the trial and conviction of the principal, or that the principal is unknown, or for other reason can not be tried.

4. The indictment charges that the four alleged principals committed the offense of murder upon named persons, and then proceeds to charge that J. G. Rawlins and Frank Turner, being absent at the time of the commission of the crime, did "unlawfully, feloniously, wilfully, and of their malice aforethought procure, counsel and command" the alleged principals to commit the crime.   Complaint is made that there is nothing in this language which charges the alleged accessories before the fact with any act which would make them accessories.   That which makes one an accessory before the fact is the procuring, counseling, and commanding another to commit a crime, and this is the only act necessary to constitute the offense; and when it is charged in the language of the statute that the accused did procure, counsel, and command the alleged principal

to commit the crime, he is charged in terms with that which constitutes the offense, and it is hard to conceive how the charge could be made more clear and more specific.

5. The principals were jointly charged with killing each of the persons named in the indictment, and each was therefore charged with the murder of both. The allegations were sufficiently specific to put them upon notice of exactly what they were charged with, and it was unnecessary to allege which one killed Willie Carter, and which one killed Carrie Carter, when it was distinctly alleged that all were engaged in the killing of both. The objection in the demurrer that each was not put upon notice of what was charged against him is therefore without merit. The indictment also charged that the killing was done with certain guns, and the objection that there was no allegation as to what were the instruments used in the perpetration of the offense was also without merit.

6. The special grounds in the motion for a new trial filed by Milton Rawlins will now be disposed of. Complaint is made that the court overruled a motion for a continuance, based upon the absence of witnesses whose testimony was claimed to be material. In a note to this ground the judge says the motion was overruled, and counsel was notified that the case would be called for trial on the following morning, and in the meantime any number of officers required would be furnished to send for and bring into court the witnesses who were absent, and such officers were furnished, and all the witnesses were brought into court with the exception of those whom the counsel for the accused, in a subsequent recess of the court, informed the court he would not require, and when the case was called on the following morning there was no further motion for a postponement. It is apparent from this statement that this assignment of error is without merit.

7. In one ground of the motion for a new trial it is alleged that the court allowed and permitted the audience to cheer the solicitor-general while he was making his concluding argument, and failed to rebuke those engaged in this disorder. No motion for a mistrial was made, nor was any ruling invoked by counsel for the accused, because of this disorder; and the assignment of error is simply upon the silence of the judge in regard to the same. In a note to this ground the judge says that the applause was brought about by a colloquy between the solicitor-general and counsel for the accused,

in which nothing was said about the accused or any circumstance of the case, and that immediately upon the happening of the disorder he suppressed it and corrected it.   This assignment of error might probably be disposed of for the reason that the statements in the ground are not certified, as the facts stated in the certificate are antagonistic to those stated in the ground.   But without basing the matter solely upon this point of practice, it is sufficient to say that neither in the ground nor in the certificate of the judge are the facts sufficiently stated for this court to determine whether the incident in its details was of such a character as to be so prejudicial to the accused as to require a reversal of the judgment, even if the question were properly before us upon an assignment of error based upon some ruling of the judge at the time the disorder occurred.   Of course a judge should suppress disorder and rebuke and punish those engaged in it, without waiting for action on the part of the counsel or parties interested in the case; but, as a general rule, error can not be assigned upon the failure of the court to interpose under such circumstances of its own motion.   Even in a criminal case a judgment will not ordinarily be reversed for misconduct of counsel, parties, or spectators, unless a ruling upon such conduct was invoked from the judge at the time it occurred.   *O'Dell* v. *State,* 120 *Ga.* 152 (5).   The facts of the *Woolfolk* case were extraordinary and exceptional, and the reversal of the judgment in that case was not based entirely upon the misconduct of the spectator, which had passed without a proper rebuke from the judge.   See *Woolfolk* v. *State,* 81 *Ga.* 552 (4).

8. The four persons charged as principals in the indictment, and one of them charged as an accessory before the fact, were all arraigned at the same time, over the objection of the counsel for the accused in the present case.   Error is assigned upon this action of the court.   It is contended that as the accused had elected to be tried separately, they should be arraigned separately.   There is no merit in this exception.   All of the persons charged in the indictment may be arraigned at one time; and so long as their right to a separate trial, if they desire it, is not interfered with by the court, a joint arraignment can not be said to be prejudicial to any one of them.   As the judge recognized the right of the accused to a separate trial and accorded them that trial, we can not see that any harm resulted from the joint arraignment.   2 Enc. Pl. & Pr. 678.

9. While the case was in progress the sheriff came into court, and in the presence of the jury said to the judge, "Mrs. Rawlins sent me for her grip down stairs. I have it here, and it has a pistol in it." Counsel for the accused immediately objected to this statement unless it was explained, stating that Mrs. Rawlins had been traveling through the country with her daughters, and that she carried the pistol for their protection. The judge then remarked that he would instruct the sheriff to take the pistol out of the grip before delivering it to Mrs. Rawlins. The court then took a recess, and, upon reassembling, counsel for the accused made a motion for a mistrial, contending that the sheriff had come into court in a very excited manner and had made the statement in the presence of every one in the court-room, including the jury. The court then proceeded to hear evidence from Mrs. Rawlins and the sheriff as to the circumstances under which the pistol was placed in the grip, and also the purpose of Mrs. Rawlins in having it there; and it appeared that it was there solely for the purpose stated by counsel, that is, for the protection of Mrs. Rawlins and her daughters while traveling through the country. It also appeared that the grip was sent for at the request of Mrs. Rawlins, to take therefrom a letter which counsel desired. The solicitor-general admitted in the presence of the jury that the entire statement and contention of counsel as to the presence of the pistol was as stated by him, and that it was not placed in the satchel or brought into court for any improper purpose; and moved the court to instruct the jury that the incident should not in any way prejudice the case of the accused. The court, after hearing the evidence, as well as the statement of the solicitor-general and counsel for the accused, overruled the motion for a mistrial, and instructed the jury that the incident should have no weight with them in making up their verdict. Without reference to the manner in which the sheriff obtained the information that the pistol was in the satchel, whether by an unauthorized search or not, when it came to his knowledge that it was there and the satchel was to be brought into court, it was his duty to inform the judge of this fact. But this should have been communicated to the judge privately, and not in open court in the presence of the jury; and the conduct of the sheriff in making this communication in this public manner was reprehensible. But after the entire matter had been investigated, and the jury fully informed

as to the circumstances, as seems to have been the case from the record, and an instruction given by the judge that the incident should have no weight whatever with them, it was not error to over-rule the motion for a mistrial.

10. One of the witnesses for the State was an alleged accomplice. It appeared that he had made a confession to the officers who arrested him, as to his participation in the crime, and that he was then called as a witness for the State and testified as such. Objection was made to the admission of his testimony, upon the ground that he had made a confession to the officers which was improperly obtained, being the result of his being put in fear at the time he made it. It was contended that the confession was not voluntary, and was made under such circumstances that if the witness had been on trial it would not have been admitted as evidence. The contention is, that, as this confession would not be admissible against him if he were placed on trial, he was not competent to testify against his associates to the facts disclosed in the confession and which he reiterated upon the witness stand. Evidence that the officers first obtained information as to his participation in the crime by placing him under the influence of fear, and that at the time of the trial he still labored under this fear, would be admissible to go to the jury along with his testimony, in order that they might determine upon the weight to be given it; but neither the improper methods used in obtaining the confession, nor the apprehension under which the witness labored during the trial, would render him an incompetent witness. The court permitted the accomplice to testify not only as to what had previously been said by him in his confession to the officers, but also as to all the circumstances under which the confession had been made. His testimony as to the confession and all the circumstances went to the jury. They were thus enabled to determine whether his evidence was of such a character as to be entitled to any weight at all. There was no error in admitting the testimony of this witness, nor in any of the various rulings complained of in reference to its admission.

11. Evidence was admitted tending to show that there was a state of bad feeling between the Carter family and the Rawlins family, and especially between the heads of the two families. This evidence was objected to on the ground that the evidence of bad feeling should be limited to any bad feeling that might exist between Milton

Rawlins and the children that were killed. There was no merit in this objection. The state of feeling existing between the father of the accused and the father of the deceased was pertinent, and especially was it pertinent to show a state of bad feeling generally between the two families. The weight, of course, to be given to this testimony was to be determined by the jury in ascertaining whether there was a motive for the accused on trial to commit the crime with which he was charged.

12. Evidence was admitted showing that J. G. Rawlins had had a conference with the witness Moore before the crime was committed, in which he gave him certain instructions in reference to the commission of the crime; and there was also evidence that on the morning before the killing J. G. Rawlins went to the house of a neighbor and obtained a gun which belonged to him, but which had been in the possession of his neighbor for about a year, and also that on the morning after the killing J. G. Rawlins obtained a loan of $110 from a bank in Valdosta. The objection to this testimony was that anything J. G. Rawlins did or said in the absence of Milton Rawlins was inadmissible against the latter. It appeared from the testimony of Moore, the accomplice, that he and the three sons of J. G. Rawlins were to slay the entire Carter family, and that Moore was to receive $100 for his participation in the crime, and that this $100 was to be paid him the morning after the crime was committed. There was evidence tending to establish that the persons indicted had conspired to slay the entire Carter family, and that J. G. Rawlins was the instigator and originator of the scheme. Whether this conspiracy was in fact established was a question for the jury, but there was enough evidence tending prima facie to establish it to authorize the admission of the acts of the alleged conspirators, the jury to give such evidence such weight as they saw fit in the event the conspiracy was established. There was no error in admitting this testimony. *Carter* v. *State,* 106 *Ga.* 372 (5), and cit.

13. The court, in charging upon the defense of alibi, used language which tended to create the impression that the defense of an alibi must be established to the satisfaction of the jury beyond a reasonable doubt; but before the jury retired the court called their attention to this portion of the charge, and corrected any error thus made. The court also admitted in evidence an indictment against

J. G. Rawlins, which charged him with assault with intent to murder upon Carter, the prosecutor, and a peace bond which had been given by Rawlins at the instance of Carter. The solicitor-general was permitted to withdraw this evidence from the consideration of the jury; and the jury was instructed by the judge that the evidence was withdrawn from their consideration, and they were not to consider it at all. While we realize that an impression once made upon the minds of a jury, either by the charge of the court or by the admission of evidence, can not always be entirely removed, still when an error has been committed and the judge does all in his power to correct the effect of the error, the law generally prevents the party against whom the error was committed from complaining of it. In regard to the error in the charge, as well as the error, if it was such, in admitting the evidence, the correction was as complete in each instance as was possible; and we can not say that there is anything which appears in the record to show that the prejudicial effect of the error upon the minds of the jury was not removed. There may be an error of such a character that nothing done by the judge can correct the harmful effect of it, but this occurs in rare instances; and it is almost universally held that an error in instruction is sufficiently corrected by attention being called to the improper instruction and a proper instruction being given, and that an error in the admission of evidence is sufficiently corrected by its being withdrawn from the consideration of the jury, with a statement to them that they are not to consider it. Any other general rule than this would result in a verdict being vitiated in every case where the evidence was voluminous, the charge lengthy, and the trial protracted.

There was no error in failing to charge upon the law of confessions and the law of duress, as there was no evidence authorizing instructions upon these subjects. There were a number of other assignments of error upon the charge; but when these portions are read in connection with the entire charge, it is apparent that there was nothing in any of them which would prejudice the accused. There was sufficient foundation for the admission of the dying declarations. If any fuller instruction on the subject of dying declarations than those given was desired, counsel for the accused should have presented it in an appropriate written request. The counsel in his argument to the jury having admitted that a murder

had been committed, there was no error committed by the judge in referring to that fact in his charge.

14. The motion for a new trial in the case of Jesse and Leonard Rawlins raises a number of questions which are similar in their nature to those raised by the motion filed by Milton Rawlins; and so far as these questions are concerned, further discussion is unnecessary. We will now treat of such of the special grounds as relate to questions not already discussed. Objection was made to the panel of jurors put upon the accused, upon the ground that there were included in such panel jurors who had been called and rejected on the trial of Milton Rawlins. These objections were overruled, and this ruling is assigned as error for the reason that such jurors had formed or expressed an opinion as to the guilt or innocence of the accused. This objection was in the nature of a challenge to the array. It is well settled that it is not a proper ground for a challenge to the array that the panel includes individual jurors who would be disqualified to try the case. Such jurors can be eliminated from the panel by a challenge to the poll. As was said in *Humphries* v. *State,* 100 *Ga.* 261: "If the panel contained any jurors who were subject to challenge, the accused would have an opportunity, when they were put upon their voir dire and qualified, to show the fact of such disqualification by putting the individual juror upon the court as a trior. It is possible that a challenge to the array would be overruled where the entire panel was composed of persons who would be subject to challenge to the polls; and, on the other hand, a panel made up of jurors not subject to any challenge to the polls might be set aside on a challenge to the array. A challenge to the array goes to the form and manner of making up the panel, without regard to the objections to the individual jurors who compose it; while the challenge to the poll is directed solely to an objection which is inherent in the individual juror." See also *Thompson* v. *State,* 109 *Ga.* 272; *Teal* v. *State,* 119 *Ga.* 102 (2); *Taylor* v. *State,* 121 *Ga.* 348.

15. The accused being tried jointly, each demanded the right to challenge peremptorily twenty jurors. This right was accorded to them. Their counsel then objected to the solicitor-general being allowed twenty peremptory challenges. In *Cruce* v. *State,* 59 *Ga.* 83, it was held that where two are tried jointly for a felony, each is entitled to twenty peremptory challenges. In *Butler* v. *State,* 92

*Ga.* 601, it was held that where two are tried jointly for a capital offense, and neither waives his peremptory challenges, the State is allowed one half the whole number of challenges which the law allows to both.

16. Exception was taken to the following charge: "The testimony of an accomplice in a case is not sufficient of itself to convict a party charged with the commission of a crime, under the law; that testimony, in order to authorize you to convict, must be corroborated, and the extent of the corroboration of the testimony is a question entirely for the jury; however strong it may be, or however slight it may be, is a question for you to determine, and you will give it such credit as you believe under the law it is entitled to." The assignment of error upon this charge is that the judge instructed the jury that slight evidence might corroborate the testimony of an accomplice, and that there was a failure to instruct the jury that corroborating evidence must connect the accused with the commission of the crime. The jury are not authorized to convict upon the uncorroborated testimony of an accomplice. What shall be the extent of this corroboration is a question to be determined by the jury. It may be strong, or it may be slight; but in each case it must be of such character as to satisfy the minds of the jury as to the connection of the accused with the criminal enterprise. As was held in *Chapman* v. *State*, 109 *Ga.* 164, the judge should not charge the jury as matter of law that slight evidence is sufficient to corroborate the testimony of an accomplice. But as matter of fact slight evidence is sufficient if it is satisfactory to the minds of the jury. The objection to the charge in the *Chapman* case was that it was calculated to make an impression in the minds of the jury that any corroboration, however slight, would compel them to treat the testimony of the accomplice as corroborated. In the present case the judge distinctly charged the jury more than once that the testimony of an accomplice uncorroborated was not sufficient to convict. He also charged fully upon the law of reasonable doubt, and the extract from the charge above quoted, when taken in connection with the entire charge, was not calculated to mislead the jury in regard to the amount of corroboration required. He tells them in terms it is a question for them to determine, and they are to consider the corroboration, whether it be strong or slight; and the effect of the charge is simply to state that it is for the jury to de-

termine whether the corroboration was of such a character as to satisfy their minds. The charge did not in distinct terms state to the jury that the corroboration must connect the accused with the criminal enterprise. The extract from the charge complained of is upon the extent of the corroboration so far as its weight is concerned; and upon such a charge an assignment of error can not be properly based which merely complains of the failure to charge upon another distinct proposition relating to the subject of corroboration. The extract from the charge being substantially correct in regard to matters therein dealt with, the accused can not complain that other and distinct propositions relating to the same subject were not embraced.

17. Complaint is made that the court refused to grant a mistrial on account of certain remarks made by one of the counsel for the State. In his opening argument counsel used the following language: "Has the time come in the good old county of Lowndes when a man can not lie down in his home at night and be protected from midnight assassins? It is time for you to put a stop to it, and put such defendants as these out of the way. We do not need them here." The ground of the motion recites that counsel for the accused immediately asked the court to declare a mistrial, and that counsel who had made the remarks then said: "I withdraw my remarks. I do not want to do anything to hurt the defendants before the jury. I apologize for what I have said to the court and to the jury, and I ask his honor to withdraw it from the jury." The court then said: "Yes, gentlemen, these remarks were improper from the associate counsel, and I withdraw what he said from your consideration altogether, and I instruct you that counsel's remarks have no weight with you in your deliberations. I do not think that the remarks were cause for a mistrial; so I refuse to withdraw the case from the jury, and I overrule the motion of defendants' counsel to declare a mistrial." In a note to this ground the judge states that counsel for the accused first moved the court to instruct the jury not to consider the remarks, which was done in the language set forth in the ground; and after the court had complied with that request and ordered the case to proceed, counsel for the accused then asked that a mistrial be declared, and this motion was overruled. Without determining whether under all the circumstances the remarks of counsel for the State were sufficient to require a mistrial,

the refusal to declare a mistrial was not error. Improper remarks of counsel are subject to correction either by proper instruction to the jury or a mistrial, according to the nature of the remarks and the circumstances under which they were made. Counsel for the party claimed to have been prejudiced by the remarks is authorized to determine what his remedy shall be, whether he shall ask for appropriate instructions, or whether he shall ask for a mistrial. When he has asked for one method, and that method has been followed by the court at his instance, he can not ask subsequently that another method be adopted. See, in this connection, *Patton* v. *State,* 117 *Ga.* 231 (10).

The foregoing disposes of such of the special grounds in the motion for a new trial in the case of Leonard and Jesse Rawlins as required an elaborate discussion. The instruction on the subject of confessions was appropriate in the connection in which it was used; it being contended that the alleged accomplice had been compelled to confess under the influence of fear, and that when he testified he was still under the influence of such fear. The other instructions which were complained of, when taken in connection with the entire charge, were not calculated to mislead the jury in regard to any of the vital issues in the case. The instructions as to the form of the verdict were sufficient to show the jury that they were authorized to acquit one or both, or convict one or both, as the evidence authorized; and the refusal of the written request to charge on that subject is no cause for a new trial.

18. The motion for a new trial filed by J. G. Rawlins presents some questions similar to those involved in the other cases, and nothing further need be said concerning them. Those grounds raising other questions will now be considered. After the trials of the other defendants, the case of J. G. Rawlins was called, and a motion for a continuance was made upon the ground that the physical condition of the accused was such that he could not go safely to trial. The accused presented his own affidavit to this effect. The court heard testimony of two physicians, one of whom was at the time attending the accused. Both of them swore that while he was not perfectly well, he was as well as he had been for a year or more previously to the trial, and was as well as he probably ever would be, and that in their opinion he was not in such a condition that a trial would be either dangerous or specially harmful to his health.

In a note to this ground of the motion the judge states, that he was satisfied, from the evidence, that the accused could go to trial without detriment to his health; that during the trial of his sons he had been in the court-house, and had taken an active part in their defense so far as consulting with counsel was concerned, and had attended the entire trial of each, except possibly during the argument of the cases, and that during the trial of his own case he conferred with his counsel "with apparent ease and activity, and ample strength and ability to do the same, and that with ease and strength he went upon the stand and made his statement, which consumed about two. hours and a half." The statement of the judge is in effect that neither before the trial nor during the trial was there anything apparent in the condition of the accused to indicate that his condition was such that he could not aid his counsel in the conduct of the trial or sustain the strain of the same. Motions for continuance upon the ground of the physical condition of the accused are addressed to the discretion of the judge. He may consider the testimony produced, as well as the condition of the accused as it appears to him. In such cases the good sense, sound judgment, and humanity of the trial judge must be relied upon as safeguards against injustice. *McDaniel* v. *State,* 103 *Ga.* 268. It does not appear that there was any abuse of discretion in refusing the continuance.

19. When the motion for a continuance just referred to had been overruled, Mr. Cooper, counsel for the accused, made a statement in his place, which was in effect as follows: that all of the preceding week he had been hard at work trying the cases of Milton Rawlins; that the weather was the hottest he had ever felt; that he worked from Monday morning until Friday night; that he was under great mental strain on account of the intense interest he felt in the case; that he had been notified by the judge to return for the trial of this case; that he had endeavored to obtain a leave of absence on the ground that he was worked down, but the judge refused to grant the same, stating that this case must be tried; that since Monday morning of the present week (the day on which this statement was made being Thursday) he had been engaged in the trial of Leonard and Jesse Rawlins, being leading counsel in that case, had examined the witnesses, and at the suggestion of his associate had argued the case before the jury, making an argument of two hours and a half

in length; that he had contracted a cold, his voice was weak and his throat out of order, and he did not feel that he was physically able at this time to defend a man charged with murder; that he did not believe he was physically able to do justice to the case; that he needed a rest, and asked a continuance until his physical condition was such that he could properly represent his client.   The judge remarked that he did not remember any formal application for a leave of absence, but that counsel might have stated to him privately that the case should go over; and while he knew it had been a heavy tax upon counsel and all others in the case on account of the condition of the weather, still counsel had been apparently as active as any member of the bar, more so than most of them; and while he may have contracted some cold, as a great many others had, the court did not think from the appearance of counsel and his connection with the case up to that time that he would not be able and fully competent to do justice to his client; and under such circumstances, as there were associate counsel, and the term had been specially called to try these cases, he did not think sufficient cause had been shown for a continuance.   In a note to this ground the judge says that counsel had already made two motions to continue the case at the same term of the court, which were overruled, and that, as "an additional reason for overruling the motion, the appearance, voice, energy, and activity and conduct of the able attorney, Hon. John R. Cooper, at the time he was making the motion, in the judgment of the court demanded that the motion be overruled."   And the judge further states that, after overruling the motion, "the activity, energy, and ability exercised and manifested by counsel during the trial could scarcely have been surpassed;" counsel having fully and elaborately argued the case for the space of two hours and a half to the jury.

The rule of court requires that all grounds of a motion for a continuance shall be urged and insisted upon at once; "and after a decision upon one or more grounds, no others afterwards urged shall be heard by the court."   Civil Code, §5675.   The accused had united with his three sons in a motion to continue the case, before any of the trials, on the ground of absent witnesses.   This motion was overruled for the reasons set forth in that paragraph of the opinion which deals with the assignment of error in that ground of the motion for a new trial filed by Milton Rawlins.   At the time

that this motion was made, all grounds for continuance which then existed should have been taken advantage of. Of course the rule of court would not prevent the judge from .entertaining a motion for continuance thereafter upon a ground which had subsequently arisen. When counsel moved to continue the case on account of the physical condition of the accused, as it was contended that this condition resulted from the trial of his sons, being a cause which arose after the first motion to continue was disposed of, there was no error in the court's entertaining this motion. But counsel should have embraced in this motion both grounds then claimed to exist, that is, the physical condition of the accused, and the physical condition of counsel. It appears from the record that the motion to continue on account of the physical condition of the counsel was made immediately after the motion to continue on account of the physical condition of the accused was overruled. If both grounds existed, as must have been the case, under the rule of court counsel could not make the motion upon one ground only, and, that having been overruled, then urge the other. In addition to this, there does not seem to have been any abuse of discretion in overruling the motion to continue on account of the condition of counsel, even if the court had authority to entertain it. The illness of counsel when there is but one, or of the leading counsel when there is more than one, is a sufficient ground for a continuance. Penal Code, §964. "Illness" is defined to be an attack of sickness, ailment, malady, disease. Cent. Dict. The illness of counsel contemplated by the law is such a physical condition resulting from sickness, malady, or disease, as would prevent counsel from properly attending to his duties as such. It does not mean any mere indisposition, but indisposition of such character as to disqualify a person from the discharge of those delicate and responsible duties which devolve upon counsel in the trial of a case. The determination of whether such an illness in fact exists as is contemplated by the law is reposed in the trial judge before whom the motion for a continuance is made. If the counsel who is ill is absent, evidence should be heard as to his condition; and where the condition of counsel is in question the court is authorized to determine this question like all other questions of fact submitted to its decision. If counsel who makes the motion is himself present in court, making and urging the motion in his own proper person, the judge may

determine the question by the condition of counsel as it appears to him.   Especially would this be the case where counsel has been engaged for a number of days in the trial of other cases before the same judge, who is thus enabled to determine by a trial, in the nature of a trial by inspection, whether counsel's condition on the day the motion is made is essentially different from what it was on other days when he was actively engaged in the conduct of other cases, without complaint as to physical inability.   The judge based his refusal to continue the case upon the ground that the energy, activity, and general appearance of counsel at the time that he made the motion was such as to impress him with the fact that while counsel might have been laboring under an indisposition from cold and work in the other cases, he was still mentally and physically competent to discharge the duties incumbent upon him in the coming trial.   The judge states that this impression, made at the time that the motion was made, was emphasized and confirmed by the able manner in which counsel conducted the case through a tedious trial of three days.   In addition to this, if the statement of counsel as to his condition is considered in its entirety, it is apparent that he was not ill at all within the sense of the statute.   He had a slight cold, probably some huskiness in his voice; but he was suffering under no attack of sickness, disease, or malady, within the meaning of the word "illness" as it is ordinarily understood.   He was merely tired, and this condition of body and mind is not sufficient to postpone the trial of a case, unless it reaches the point where mind and body are so exhausted that the duty in hand can not be performed with justice to those to whom the duty is due.   All who have ever been engaged in the practice of law can appreciate that counsel very often are required to perform their duties when they are physically and mentally tired; but the business of the courts would become blocked if such a condition were recognized as a ground for continuance, when the tired condition of counsel was short of exhaustion, mental or physical.   During a term of court continuing for two weeks, counsel who are engaged in every case that is tried during that time, of course, become tired and more or less exhausted.   The same is true of the judge and the jurors, and all others upon whom the responsibility of the administration of the law rests.   But a case must not be postponed on account of the physical condition of counsel being affected by the work in the line

of his profession or otherwise, unless the physical condition brought about by the work is such that further effort would imperil his health, or an attempt to perform the duty, under the circumstances, would result in injustice to those interested in the performance of a duty owed· to them. This matter, as all matters relating to the continuance of cases upon similar grounds, is addressed to the discretion, judgment, and humanity of the trial judge, and nothing appears in the record which authorizes us to say that this discretion has been abused in the present case. While we have no doubt that the motion to continue was made in the utmost good faith, and counsel really believed at the time that he was in such an exhausted condition that he could not do justice to his client, still, from all that appears in the record, we think, with the trial judge, that our brother was mistaken as to what was really his condition. It is apparent from the record and the assignments of error therein that counsel conducted this case with his usual skill and ability; and if any injustice has been done to his client, it has not been made to appear.

20. Upon the trial of one charged as an accessory before the fact it is incumbent upon the State to prove the guilt of the person charged as a principal, beyond a reasonable doubt. The record of the conviction of the principal is conclusive evidence as to the fact of his conviction, and is prima facie evidence of his guilt. The fact that the State introduces the record in evidence does not preclude the introduction of other evidence tending to establish the guilt of the principal. Therefore, as a general rule, in the trial of an accessory any evidence which would be admissible against a principal if he were on trial is admissible on the trial of an accessory, for the purpose of establishing the guilt of the principal. Hence there was no error in admitting in evidence the dying declaration of Willie Carter, to the effect that he was killed by Milton and Jesse Rawlins,, nor in the admission of other evidence which tended merely to establish the guilt of others charged as principals in the indictment. The charge of the judge, when considered as a whole, properly limited evidence of this character to the purpose for which it was introduced. There was nothing in the admission of the evidence, nor in the charge of the court in relation thereto, which was prejudicial to the rights of the accused.

21. Evidence was offered to the effect that the accused had threatened the life of the father of the deceased, and had offered to pay persons to kill him. Exception is taken to the refusal of the judge to rule out this evidence upon the ground that the father was not killed, and therefore the evidence was irrelevant. There was also introduced in evidence a peace bond which the accused had been required to give at the instance of the father of the deceased, and an indictment for assault with intent to murder against the accused, in which the father of the deceased was prosecutor. Exception is also taken to the refusal of the court to rule out this evidence on the ground above referred to. This evidence was properly admitted. The deceased were killed at the home of their father by persons who made a deadly assault upon every member of their family that came out of the house. The father was in the house at the time that the slayers of the children surrounded the same, and these threats against the head of the family, and offers of money to others to kill him, could be properly considered by the jury in determining whether those who slew the children went there under the instigation of one whose enmity against the head of the family was such that he had threatened to take his life, and had even offered to pay an assassin to slay him. The weight to be given this evidence was of course for the jury, but it was a circumstance to be considered by them in determining whether the accused had instigated the killing of the children as a part of the scheme to kill the father, or whether the killing of the children could have arisen as a natural consequence of a result of the scheme to kill the father in his home.

The court charged the jury upon the law of confessions, but it appears that this was done at the request of counsel for the accused. While the charge was inappropriate to the case, no exception can be taken to the error which counsel thus caused the court to commit. The testimony showing that on the day of the killing the accused left a watermelon at a store near by his home for Frank Turner, who was jointly indicted with the accused as an accessory before the fact, was properly admitted as a circumstance which the jury might consider in determining whether the testimony of the accomplice Moore was corroborated. It was of little weight, but was nevertheless admissible for what it was worth.

What has been said disposes of all the assignments of error in the motion for a new trial filed by J. G. Rawlins, relating to the admis-

sion of evidence and the charge of the court, which require any special notice.

22. The only remaining ground containing a special assignment of error in the motion for a new trial of J. G. Rawlins, which need be referred to, is that which complains that the verdict was received on Sunday. In *Bass* v. *Irvin,* 49 *Ga.* 436, it was held that a verdict received on Sunday was illegal and a nullity. In *Henderson* v. *Reynolds,* 84 *Ga.* 159, it was held that the question of the legality of a verdict received on Sunday was not necessarily involved in the case of *Bass* v. *Irvin,* and that therefore that case was not binding authority upon that point; and having thus disposed of the case of *Bass* v. *Irvin,* a distinct ruling was made that there is no legal or moral wrong in a judge receiving a verdict and allowing a jury to disperse on Sunday. This ruling was followed in *Weaver* v. *Carter,* 101 *Ga.* 206, in which two Justices dissented, but filed no dissenting opinions. It is true that both of these were civil cases; but we see no reason why the rule should not be applicable to criminal cases as well. The soundness of the rule is demonstrated in the opinion in the case of *Henderson* v. *Reynolds,* and we do not deem it necessary to attempt to add anything to the reasoning therein contained.

23. After laborious and earnest investigation of all the special assignments of error in the motion for a new trial filed by J. G. Rawlins and his three sons, we have been unable to find any error which in our opinion requires a reversal of the judgment. It remains, therefore, only to be considered whether the evidence was sufficient to authorize the verdict. So far as Milton and Jesse Rawlins are concerned, the evidence amply authorizes the verdict, without reference to the testimony of the alleged accomplice. There was not only positive testimony as to their presence at the scene of the killing, but there was the dying declaration of Willie Carter that they were his slayers. This evidence alone is sufficient to sustain the verdict as to them. There was no evidence that Leonard Rawlins fired a gun, though there is evidence that he was present with a gun at the time that Milton and Jesse killed Willie and Carrie Carter, and that he was actively participating with Milton and Jesse in the acts done by them resulting in the slaying of the two Carter children. Even if this were not sufficient alone as to him, the evidence of the accomplice was that he went with the others for the purpose of engaging in the slaughter of the entire Carter

family, and the evidence of his presence and his conduct on this occasion would be a sufficient corroboration of the accomplice to authorize a jury to convict him as a principal in the crime.

24. Whether the evidence was sufficient to authorize a verdict against J. G. Rawlins as an accessory before the fact depends upon whether the testimony of the accomplice Moore was sufficiently corroborated. He swore that J. G. Rawlins agreed to pay him $100 to go with his sons to the house of the Carters and there slay the entire family, the money to be paid on the following morning; that he gave him and his sons minute directions as to how. Carter and his wife were to be killed, the two older children and the little children; that he gave him a gun with which he was to kill Carter and his wife, a pistol with which he was to slay the older children, and a knife with which he was to cut the throats of the little children; that in pursuance of the plan originated by J. G. Rawlins, and endeavoring to carry out his instructions, he (Moore) with the three Rawlins boys repaired to the house of Carter after dark; that a barking of a dog attracted the attention of those within the house; that Willie Carter, a young boy of sixteen, and his sister Carrie Carter, a girl of about fourteen, came out into the darkness to see what caused the barking of the dog; that they both were shot down by Milton and Jesse Rawlins, the girl being killed instantly, Willie Carter being able to crawl back into the house, where he made the declaration to his parents as to who were his slayers, and died the next morning from the effect of the wound he had received. It is hard to conceive of a murder which was more atrocious in plan, and an execution of a plan which, though only partial, was more heartless in its nature. It required a demon to conceive the plan, and only a monster would have committed its execution into the hands of his own youthful offspring, under the supervision of a vicious negro hireling. Whether J. G. Rawlins was the originator and instigator of this plan which was only partly carried out depends upon whether the jury was authorized to treat the circumstances hereinafter referred to as sufficient evidence to corroborate the testimony of a self-confessed assassin who claims to have been the hireling of J. G. Rawlins. It is not necessary, in order to convict upon the testimony of an accomplice, that the corroborating circumstances should be sufficient to authorize a conviction. If such were the law, there would be no reason for introducing the

testimony of an accomplice. The corroborating circumstances must connect the accused with the commission of the crime, and must be sufficient in connection with the testimony of an accomplice to satisfy the jury beyond a reasonable doubt that the accused is guilty. The corroboration may be strong or it may be slight; but whether it is sufficient to connect the accused with the commission of the crime, or whether, taken in connection with that testimony and all the other facts and circumstances of the case, the accused is guilty beyond a reasonable doubt, is a question to be decided by a jury. It appeared from the evidence that there had been a state of bad feeling between the elder Carter and the elder Rawlins for a number of years. It also appeared that Rawlins had made threats against the life of Carter at various times, extending from 1902 down to a short time before the homicide; that the year preceding the murder, and the year before that, he had said that before the Carters should stay where they were he would kill them all, from the baby up. He told a negro, during the year that the crime was committed, that if he would kill Carter it would be worth $100 to him; and he told another negro, about a week before the killing, that he would give him $125 if he would kill Carter. It also appeared that on the morning before the killing Rawlins went to the house of one McDonald, and carried a gun which had the stock so cut that it could be easily recognized and was known as the gun of Rawlins, and left it there, and secured in its place a gun belonging to Rawlins which McDonald had had for nearly a year, having no particular mark; and there was evidence showing that this gun was found, along with a knife which was shown to be the knife of Rawlins, in the shanty where Moore was arrested. The sheriff testified that Rawlins told him that he was satisfied that the gun which was found in Moore's shanty was his gun, and that Moore must have stolen it out of his house while he was at supper, and must have found the knife about the well or about the yard. He told a neighbor that somebody was going to kill Carter, and that when it was done the neighbor should turn his back so he would not see anything. He also said to a witness, the day before the murder, that he was in an awkward place, for if anything should happen to Carter that night it would be laid on him. He also said that if Carter should get killed, or his house burn up, or anything like that happen, it would be laid on him. A witness testified that he said, a year before the

trial, that he did not believe it would be a sin in the sight of God to kill a man like Carter. Another witness testified that, at the term of court just before the killing of the Carter children, Rawlins stated that he would not swear that he would not kill Carter before court was over. There was also evidence that on the evening before the murder he came to Valdosta and endeavored to obtain $100 from the cashier of a bank, but could not obtain it that evening, because the bank had closed; that on the following morning he negotiated a loan at the bank for $110, and left Valdosta in a hired conveyance, going in the direction of his home, but dismissing the conveyance some distance before reaching home, saying to the driver that he might meet some of his sons up there. There were other circumstances of more or less significance, indicating the complicity of J. G. Rawlins in the crime, but those that have been referred to are the more important that the record discloses. Those that have been referred to are, in our opinion, sufficient to uphold the verdict of the jury. The credibility of the witnesses was for them. They have seen proper to give credit to the witnesses testifying to these facts. They have also seen proper, in the exercise of the authority which the law vests in them, to treat these circumstances as sufficient to corroborate the testimony of the accomplice. The trial judge has approved their finding, and we can not say that the corroboration was of such a character that the jury were not authorized to base a verdict thereon. We see no sufficient reason for reversing the judgment refusing a new trial.

25. The negro Turner, who was also charged in the indictment as an accessory before the fact, was convicted; and his motion for a new trial presents, besides the general grounds, several special assignments of error. As we have reached the conclusion that the verdict was not supported by the evidence as to him, it is not necessary to deal with the special assignments of error. The evidence for the State consisted of the testimony of the negro Moore, the alleged accomplice who was indicted as a principal, and of course can not be upheld unless his evidence was corroborated in such a way as to connect Turner with the commission of the crime. A careful reading of the brief of evidence has failed to disclose to us any such corroboration as would authorize the verdict. It was therefore error to refuse to grant him a new trial.

*Judgment on the bill of exceptions of Turner reversed.*

*Judgment on all the other bills affirmed. All the Justices concur.*