A jury found this appellant guilty on a trial on an indictment which charged in pertinent part the following:
 "ROY ALLEN SCOTT . . . did in the course of committing a theft of lawful currency of the United States of America, the specific denomination(s) of said currency being unknown to the Grand Jury, of the approximate aggregate value of One Thousand Six Hundred Fifty Four and 35/100 dollars ($1,654.35), the property of Grand Pak, Incorporated, doing business as Grand Pak number one, use or threatened the imminent use of force against the person of Manon Boggs, with the intent to overcome her physical resistance or physical power of resistance, while the said ROY ALLEN SCOTT was armed with a deadly weapon, to-wit: a gun, in violation of § 13A-8-41 of the Code of Alabama. . . ."
The cited Section of the Code denominates the particular crime as Robbery in the First Degree and classifies it as a Class A felony. Section 13A-5-9 (c), provides:
 "In all cases when it is shown that a criminal defendant has been previously convicted of any three felonies and after such convictions has committed another felony, he must be punished as follows:
 ". . . (3) On conviction of a Class A1 felony, he must be punished by imprisonment for life without parole."
In accordance with the applicable statutory law as quoted, the court sentenced the defendant-appellant to imprisonment for life without parole. *Page 1345 
 I.
The first issue presented by appellant is thus captioned in the brief of his counsel, the same attorney who represented him on the trial of the case:
 "THE COURT ERRED TO REVERSAL IN DENYING THE DEFENDANT'S MOTION FOR A NEW TRIAL BASED UPON THE STATE'S PURPOSEFUL, DELIBERATE AND SYSTEMATIC USE OF PEREMPTORY CHALLENGES TO STRIKE THE TRIAL JURY TO EXCLUDE YOUNG MALE MEMBERS OF THE BLACK MINORITY RACE, IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL GUARANTEE OF TRIAL BY AN IMPARTIAL JURY."
Testimony was presented by each of the parties on the hearing for the motion for a new trial, some of the witnesses testifying to the effect that counsel for the State exercised its peremptory challenges usually, if not invariably, so as to provide for a jury without any black persons thereon. The Assistant District Attorney who represented the State in the trial of the case sub judice testified that he had made it a practice by the exercise of his peremptory challenges not to challenge a juror on the panel of jurors from which the jury was selected by the method of striking solely because he or she was not a black person. We are of the opinion that the issue now under consideration is without merit, and we follow precisely what was said by Presiding Judge Bowen in the relatively recent case of Walker v. State, Ala.Cr.App.,428 So.2d 139, 141-142, cert. denied, Ala., 428 So.2d 139 (1983) as follows:
 "The defendant's rights were not violated when the State used its peremptory strikes to exclude blacks from the jury. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 524, 13 L.Ed.2d 759 (1965); Flowers v. State, 402 So.2d 1088, 1093 (Ala.Cr.App.), cert. denied, 402 So.2d 1094 (Ala. 1981). The Constitution does not require `an examination of the prosecutor's reason for the exercise of his challenge in any given case.' Swain, 380 U.S. at 221, 85 S.Ct. at 836. The fact that a district attorney used all of his strikes to exclude blacks from the jury venire does not constitute proof that there was a systematic exclusion of blacks. McCray v. State, 395 So.2d 1057, 1059-60 (Ala.Cr.App. 1980, cert. denied, 395 So.2d 1062 (Ala. 1981); Carpenter v. State, 404 So.2d 89, 95 (Ala.Cr.App.), cert. quashed, 404 So.2d 100 (Ala. 1980); Watts v. State, 53 Ala. App. 518, 301 So.2d 280
(1975). A presumption exists that the prosecutor is using his challenges to obtain a fair and impartial jury. This presumption is not overcome merely by showing that he uses all of his strikes to remove blacks from the jury. Swain, supra."
 II.
By his second issue, counsel for appellant briefly contends in his brief that the punishment of imprisonment for life without parole imposed upon "this young appellant" constitutes cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States. Appellant cites Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001,77 L.Ed.2d 637 (1983), in support of this issue. There is some similarity between the punishment in Solem v. Helm and the punishment in the instant case, the punishment in Solem v. Helm being for life imprisonment without the possibility of parole, but their similarity ends there. All of the felonies in Solem v. Helm, a total of seven, were nonviolent felonies. The conviction from which the instant appeal was taken was for a robbery in the first degree, which, without the benefit of any recidivist statute, permitted a maximum punishment that was at least the equivalent of imprisonment for life. The judgment of sentence in this case is not in conflict of anything that was said or held in Solem v. Helm.
 III.
By his next issue, appellant's attorney contends that "There was insufficient corroboration of the testimony of the accomplice to sustain the conviction of the appellant." The accomplice referred to is *Page 1346 
Charles Williams, who testified, according to the Statement of Facts in the brief of counsel for appellant, as follows:
 "Charles Williams testified that on Christmas Eve, 1983, he was with the Appellant, Roy Scott, and that together they drove from Ft. Walton Beach, Florida, in Mr. Williams' car so that the Appellant could pick up a check due him for work done on a boat. Mr. Williams testified that upon arriving in Mobile he and the Appellant went to a package store in Grand Bay where the Appellant `got out of the car, went in the store and came back and said let's go.' When the Appellant returned from inside the store, Mr. Williams testified that the Appellant was `counting the money, playing with it or messing with the money' and on the ride back to Mobile threw the white money bag out the window. On cross-examination Mr. Williams admitted that he was an accomplice to the alleged robbery and had in fact already plead guilty to a lesser count of robbery second degree."
We find that the testimony of Ms. Manon Boggs, a witness called by the State, constituted direct evidence that defendant committed robbery in the first degree as alleged in the indictment. We summarize her testimony as stated in the brief of counsel for appellant:
 "Ms. Manon Boggs testified that on Christmas Eve, 1983, she was employed at the Grand Pak, Inc., as a sales clerk, and around 7:30 P.M. a black male entered the store and demanded money from the register drawer while pointing a gun at Ms. Boggs. Ms. Boggs identified the Appellant as the black male in the store that evening, and testified that the Appellant received approximately $1,600.00 in cash and checks from the Grand Pak Store that evening. Ms. Boggs further testified that on the evening in question she was taken by a Mobile County Sheriff's Office Deputy to the Racetrack Station where she identified the Appellant in a show-up identification. Ms. Boggs testified further that in the money recovered from the vehicle in which the Appellant was apprehended she identified a Five Dollar Bill as a marked bill kept in the cash box at the Grand Pak, Inc., convenience store. Ms. Boggs testified further that on December 24, 1983, she had a heart condition and after the alleged robbery had taken two nitroglycerine tablets along with her other heart medication prior to identifying the Appellant in the show-up identification, but stated that the drugs she was taking that evening did not affect her vision."
We are confident that the testimony of Ms. Boggs constituted ample corroboration of the testimony of Charles Williams to meet the requirements of Code of Alabama 1975, § 12-21-222, which provides:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
 IV.
By the last issue presented in the brief of counsel for appellant, it is contended that, "THE COURT ERRED TO REVERSAL IN DENYING THE APPELLANT'S MOTION TO SUPPRESS THE OUT OF COURT SHOW-UP IDENTIFICATION." The issue is directed at the testimony of Ms. Boggs, which we have discussed under the heading of Issue III, particularly as to her having taken some nitroglycerine tablets. The following constitutes the argument of appellant's counsel in its entirety as to the fourth issue:
 "In the proceedings below the evidence revealed that the defendant was identified in a show-up identification approximately 45 minutes to an hour after the alleged robbery occurred. The victim of the alleged robbery admitted under oath that on the evening in question she had taken two nitroglycerine tablets after the robbery and prior to making the *Page 1347 
identification of the Appellant as the perpetrator of the robbery that evening.
 "In Simmons v. United States, 390 U.S. 377
[88 S.Ct. 967, 19 L.Ed.2d 1247] (1968), the Supreme Court ruled that pre-trial identifications are to be set aside on the ground of prejudice if the pre-trial identification procedure is impermissibly suggestive as to give rise to a substantial likelihood of irreparable mis-identification. The substantial likelihood of error in the identification of the Appellant as the alleged robber on the evening in question requires that this case be reversed and remanded for a new trial."
In the above quoted argument of counsel for appellant, he cites a correct legal principle in Simmons v. State, 390 U.S. 377,88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Nevertheless, we find nothing "impermissibly suggestive" in the "OUT OF COURT SHOW-UP IDENTIFICATION" by Ms. Boggs of the defendant as the person who robbed her as alleged in the indictment. The fourth issue of appellant is without merit.
Notwithstanding our determination of all of the issues adversely to appellant, the writer hereof feels that he should discuss one aspect of the factual presentation of evidence to the jury. In particular, the defendant took the stand and made known to all concerned his version of what occurred on the night of and in the general area of the crime committed, so that his version could be compared or contrasted with that of the admitted accomplice, Charles Williams. The two men were closely related since the defendant is Williams' uncle. According to the defendant's testimony, he was not at the store where the robbery occurred at the time of the robbery. Defendant testified that he and "Mr. Williams arrived in Mobile just before dark" on Christmas Eve. According to defendant's testimony:
 "A. Well, I went to visit my father. He lives in Bayou La Batre. Well, I give him my Christmas present. I left there to visit an old girl friend, which I didn't get a chance to visit. And we decided to wait awhile.
"Q. All right. Who is we?
 "A. Me and Mr. Williams. Me and my nephew, Charles. And we were in Theodore at a club. It was early and there wasn't too many people at the club.
"Q. Okay. What club you talking about?
"A. The Flamingo (phonetic) in Theodore.
"Q. It's in Theodore?
"A. Uh-huh.
 "Q. What time did you all get there and how long did you all stay?
 "A. Well, I imagine we must have got there about 6:30. Mr. Williams — well I was out with some of the fellows. We were drinking a few beers and smoking a little reefer. And he wanted to go somewhere. I think he was going to see his cousin or something he told me. So, I stayed at the club. We were playing a few cards and shooting a few dice on the outside of the club, just killing time.
"Q. Just some friends that you know?
"A. Yes, some school friends.
"Q. And did he leave?
"A. Yes, he left.
"Q. Did you leave with him?
"A. No.
"Q. When did you next see Mr. Williams?
 "A. Well, he come back and asked me was I ready to go back to Ft. Walton and I told him, no. So, he told me he had to go back and I told him I would go on back with him. Then he stated that here that —
 "Q. Well, we have all heard what he said. Now, did you leave with him at that point?
"A. No.
"Q. What did you all do next or what did he do next?
 "A. Well, we were on our way to Ft. Walton. He told me he had to stop and get some gas and that's when the arrest took place. *Page 1348 
 "Q. So, you did leave the club with him and went with him to the Racetrack Gas Station?
"A. Yes.
 "Q. Now, you have heard what he said about having to go get your check somewhere or something?
"A. Yes.
 "Q. Did that happen? Did you go to the Grand Pak Food Store and look for some check or wait for some check?
 "A. No, that's a lie. The man knows I haven't worked on a shrimp boat in over a year and he stated I was passing through, which wasn't true. I had been living there with his mother about three or four months prior to that.
"Q. And that's your sister?
"A. Yes.
"Q. You have been staying down there with them?
"A. Well, he was living there too.
"Q. So, he knew that you were there didn't he?
"A. Oh, yes, he knew very well.
 "Q. And you have been staying down there for quite a while? How long had you been staying there?
"A. In Ft. Walton?
 "Q. Right before this incident happened down with your sister?
"A. Between three and four months.
 "Q. And you are telling this jury that you did not go down there with your nephew, Charles Williams, any of the events he has talked about?
 "A. Yes, we went down there. Like I say, we went down there. Only we came to Alabama to visit my father. My father lived over here and I hadn't seen him in a while. And to see an old girl friend I hadn't seen in a while. I wanted to see her for Christmas. And this robbery and stuff and I don't know where he got that from.
 "Q. But you didn't go with him to any kind of Grand Pak Food Store?
"A. No.
 "Q. And you say you had gone down to Grand Bay to see your father?
"A. Bayou La Batre.
"Q. Bayou La Batre?
"A. Yes.
 "Q. When you were stopped by the police at that filling station, you recall that, right?
"A. Yes.
"Q. When they came up?
"A. Yes.
"Q. Did you know what you were being stopped for?
 "A. No, not until the police told us this car would fit the description of a car that was in a robbery."
Although one was the uncle of the other, both the defendant and Charles Williams were approximately of the same age. Defendant was thirty-one and Williams was twenty-eight at the time of the trial. Based on the testimony of Williams, the verdict of the jury was correct; based on the testimony of defendant, it was incorrect. Defendant, of course, had an obvious interest in testifying as he did. The interest of Williams is not as obvious, but it is reasonably clear that he obtained a benefit from his voluntary testimony as an admitted accomplice. As this conflict in the testimony indicates, a jury question was presented as to defendant's guilt, and it is not within the province of this Court to substitute its judgment for that of the jury as to the guilt of defendant.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur. *Page 1349