[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1056 
The appellant, Ricky Dale Adkins, was convicted of three counts of capital murder, as defined in § 13A-5-40(a)(1), §13A-5-40(a)(2) and § 13A-5-40(a)(3), Code of Alabama 1975, for the murder of Billie Dean Hamilton. He was sentenced to death.
The evidence tended to show that the appellant arrived in Birmingham, Alabama, on the morning of January 15, 1988, in a stolen Ford Bronco motor vehicle. After arriving in Birmingham, he ate breakfast and called his girlfriend in Texas. Then he began riding around the city looking at houses. The appellant admitted at trial that he was never intending to buy a house and, moreover, that he could not afford one, as he was unemployed. He just "like[d] looking at houses."
Around 12:00 noon on that same day, Todd and Rebecca Farmer were in the Crossgate subdivision looking at houses. As they pulled up to a house where there was an "open house," they noticed a Bronco parked out front. They went into the house and a man, who they later identified in court as the appellant, came in behind them. The Farmers engaged in conversation with the appellant and he asked Mrs. Farmer if she was a real estate agent. Mrs. Farmer replied that she was not but that she was employed at South of Town Realty in the relocation department. The appellant proceeded to tell the Farmers that his name was Thomas Barton and that he was looking for a $200,000 home. He further told them that he was a narcotics agent from Dallas, Texas, and that his wife was a gynecologist and had taken a job at Brookwood Hospital's new women's center. He went on to say that since his wife was so busy, he was going to find a house for them and their daughter.
The appellant followed the Farmers to the office of South of Town Realty. Once *Page 1057 
there, he was introduced to members of the Sanders family. They were the owners of South of Town Realty. The Sanderses asked the appellant to join them for lunch at the Green Valley Country Club and he accepted their invitation. While they were gone, Mrs. Farmer was to try to find a real estate agent who could work with the appellant that afternoon. The appellant told Mrs. Farmer that he preferred to work with a woman because a woman could relate to his wife and what she might like in a house.
When the appellant and the Sanderses returned from lunch, Mrs. Farmer agreed to show the appellant some of the various neighborhoods herself. However, when she went outside, she realized that her husband had taken her automobile to have it washed. As she was going back into the office to get keys from one of the Sanderses, the appellant said, "Let's go in my Bronco." Mrs. Farmer rejected that idea. The appellant again suggested that they take his Bronco and Mrs. Farmer refused. Finally, the two left in Tommy Sanders's car and were gone approximately 35 to 45 minutes before returning to the office.
For the rest of the afternoon, Tommy Sanders showed houses to the appellant. The appellant left South of Town Realty at approximately 6:30 p.m. He drove around Birmingham, stopping at a pet shop, a Hardee's restaurant, and a Delchamp's grocery store. Finally, he checked into the Rodeway Inn and spent the night.
On the following morning, January 16, 1988, the appellant checked out of the Rodeway Inn and ate breakfast at a nearby restaurant. From there, he went to Allison Hunter's apartment in Homewood. Miss Hunter is a teenager who had met the appellant a couple of years earlier in Alexandria, Louisiana. Since Miss Hunter was apparently not at home, the appellant left her a note, which read, "Came to see you but you were not at home. Will try again later."
At approximately 11:00 a.m., the appellant arrived back at South of Town Realty. For the next four to seven hours, Terry and Mary Ann Sanders showed houses to the appellant. At 5:00 p.m., the threesome went to Herbert and Kitty Sanders's home for dessert. The appellant stayed there a couple of hours and watched a football game.
When the appellant left the Sanderses house, he went back to Miss Hunter's apartment. Hansel Hunter, Miss Hunter's father, was at home and told the appellant that his daughter was not at home but that they had found his card. Mr. Hunter also told the appellant that his sister had called there looking for him. The appellant told Mr. Hunter that he worked for the Pinkerton Detective Agency and was on vacation. He further stated that he was probably wanted to return to work.
As the appellant was leaving the Hunters' apartment, Allison Hunter was returning home from work. The two talked for five or ten minutes and then the appellant left and went to a Burger King restaurant. After leaving Burger King, the appellant went to a bar. He slept that night in his Bronco.
On the following morning, January 17, 1988, the appellant went to a service station and used the rest room to "clean up." He then went to the Holiday Inn restaurant for breakfast. Meanwhile, the Sanderses had come by the Holiday Inn to do a "little checking out" of the appellant and discovered that he had never checked in. However, they did notice the Bronco in the parking lot with the appellant in it. The Sanderses stopped and told the appellant that they would not be able to show him any houses that day. The appellant responded by saying that he needed to spend the afternoon with friends and going to the different shopping centers and that he would look at houses on his own. This was the last time the Sanderses saw the appellant.
The appellant cleaned out the inside of the Bronco and then began another day of "looking at houses." During the mid-morning of that same day, Billie Dean Hamilton, a realtor with CKM Realty, left her home to put out real estate signs in the Riverchase area and then to go to her office to do some paperwork. As she was *Page 1058 
putting up a sign, the appellant drove up, got out of his vehicle, and began talking to her. The appellant told Mrs. Hamilton the same story he had told the Farmers and further stated that the Sanderses could not show him any houses that day. Mrs. Hamilton agreed to show him some houses.
Several residents of Riverchase saw Mrs. Hamilton in the area that Sunday morning. Around 11:30 a.m., Janice Spradling, her husband, and their three sons were on their way to a family luncheon. As they stopped at a stop sign on Riverchase Parkway, Mrs. Spradling saw Mrs. Hamilton showing a house that was diagonally across from the stop they had to make. Mrs. Hamilton was on the front porch of the home, apparently opening the front door. A white male, casually dressed, was standing directly behind Mrs. Hamilton as if he was going to enter the house with her. Mrs. Hamilton was also casually dressed. Mrs. Spradling had met Mrs. Hamilton once briefly when she was looking for a home in the Riverchase area two and a half years ago.
After looking at that house, Mrs. Hamilton and the appellant left in the Ford Bronco. The appellant was driving. Mrs. Hamilton's car was left at the house. They went to a second house and looked around. They left that house and, at approximately 1:00 p.m., stopped at a pay phone. Mrs. Hamilton called her husband, Ray Hamilton, and told him she was with a prospect showing houses.
After stopping at the pay phone, the appellant and Mrs. Hamilton went to look at a third house. Then, they went to a small convenience store for refreshments. Mrs. Hamilton again made a telephone call.
Around 2:15 p.m., Mrs. Hamilton was seen by two other people in the Riverchase area. Suzanne Chauncey was babysitting for the Hedricks on Forest Knoll Drive. Mrs. Hamilton and a man, whom Ms. Chauncey later identified in court as the appellant, came by to look at the Hedricks' house, as it was for sale. They stayed approximately 15 minutes and then left in a Ford Bronco.
The appellant and Mrs. Hamilton were not seen again until approximately 5:00 p.m. The appellant testified at trial that during this two-and-a-half-hour period, they stopped at a park and "held hands and kissed." He said they stayed at the park for about 30 minutes and then left to look at houses. At one of the vacant houses they looked at, the appellant claims, Mrs. Hamilton voluntarily had sex with him twice.
The appellant said that after the alleged sexual encounters, he and Mrs. Hamilton went to Mrs. Hamilton's office to "clean up." While they were there, Mrs. Hamilton called Virginia Benintende, an employee of First Real Estate in Hoover. Mrs. Hamilton made arrangements with Ms. Benintende to meet at a house in Inverness at 5:00 p.m. Ms. Benintende arrived first and when Mrs. Hamilton arrived, she was accompanied by a man whom Ms. Benintende identified in court as the appellant. The appellant told Ms. Benintende the same story he had told the other realtors, except this time he added that he wanted to pay cash for a house. The three looked at the house for approximately 30 minutes and then Mrs. Hamilton and the appellant left in a Ford Bronco.
The appellant testified that after leaving the meeting with Ms. Benintende, he and Mrs. Hamilton went back to the vacant house where the alleged sexual encounter occurred. Once there, he said, they had sex again. The appellant claims that they were at this house for only 10 or 15 minutes.
At this point, there is a discrepancy in the evidence presented as to what actually took place. The appellant testified that he and Mrs. Hamilton left the vacant house and went back to the Hedricks' house to look at it again and then went to Mrs. Hamilton's office to "clean up" for a second time. The appellant testified that he did not recall Mrs. Hamilton's using the telephone while at her office.
However, Penny Wileman, Mrs. Hamilton's 21-year-old daughter, received a call from her mother at 5:30 or 6:00 p.m. Mrs. Hamilton told her daughter that she had a couple more houses to look at and that she *Page 1059 
would be home shortly. Mrs. Wileman relayed this message to Mr. Hamilton.
Also, Quinn Hedrick testified that Mrs. Hamilton and the appellant arrived back at his house at 7:20 or 7:30 p.m. The appellant went back through the house quickly. He and Mrs. Hamilton left shortly thereafter. This is the last time Billie Dean Hamilton was seen alive.
The appellant testified that after leaving the Hedrick home, he and Mrs. Hamilton went to a "pink temple." He said they allegedly walked around the parking lot and talked. He said he told Mrs. Hamilton that he had some business in Georgia and needed to be heading that way.
The appellant further testified that after he and Mrs. Hamilton left the "pink temple," she directed him down a dirt road for one last sexual encounter. The appellant said he put his sleeping bag on the ground and that they "talked about the stars and the night." The appellant said that after they finished having sex, he put the sleeping bag back in the Bronco and told Mrs. Hamilton to hurry and get dressed. The appellant claims that Mrs. Hamilton called him a "bastard" and that he told her that she was "nothing but a whore." At this, he said, Mrs. Hamilton slapped him. The appellant stated that as Mrs. Hamilton bent over to pull her jeans up, he hit her in the back of the head with a wrench. The appellant said he next remembered seeing his victim lying on the ground with blood on her body. He admitted slashing both of her wrists. He says he then got in the Bronco and left.
The appellant drove onto interstate highway I-20 and headed to Georgia. On his way, he went through the victim's purse and removed her credit cards and some money. He threw the purse and its remaining contents out the window. The appellant spent that night at a Holiday Inn in Atlanta. He paid for the room with the victim's credit card.
On the following morning, January 18, 1988, Rev. Corby Isbell was traveling from Moody to Brompton. Rev. Isbell needed to relieve himself, so he pulled off on the side of the road. He drove across what he described as an "embankment" and immediately saw a body. Rev. Isbell did not get out of his truck, but instead backed out and went to the Moody Police Department to make a report. The body was later identified as being that of Billie Dean Hamilton.
Officer Chris Reeves of the Hoover Police Department was among those assigned to the case. He contacted Major Ronald Strength of the Richmond County sheriff's department in Georgia shortly after the body was found because the Hoover Police Department had received information that a white male had checked into the Holiday Inn in Augusta using a credit card with the name Billie Dean Hamilton on it. Sergeant Reeves relayed this information to Major Strength and also provided him with a physical description of the appellant and the Ford Bronco.
Major Strength, along with other Richmond County law enforcement officers, arrested the appellant at the Holiday Inn later that day. After being advised of his Miranda rights, the appellant signed a written waiver form and gave an oral statement, wherein he admitted to the murder of Billie Dean Hamilton, but denied kidnapping her, raping her, or robbing her. The Ford Bronco was impounded and its contents were inventoried.
On January 19, 1988, Dr. Joseph Embry, a forensic pathologist with the Alabama Department of Forensic Sciences, performed an autopsy on the victim. Dr. Embry observed seven very deep lacerations to the victim's scalp. There was a stab wound to the upper abdomen which was six and a half inches long. It extended into the liver, stomach, and heart.
There were six small scratches on the victim's left buttock which were consistent with fingernail scratches. She also had a bruise on the inside of her left thigh. There were bruises, scrapes and lacerations on both hands. Dr. Embry testified that these were defense wounds.
When Dr. Embry examined the victim's oral cavity and lungs, her mouth and throat were filled with dirt and small rocks that went through her larynx all the way down *Page 1060 
into her lungs. It was this impacted dirt in the victim's airway, in association with the stab wounds and blunt force trauma to the head, that caused the victim's death. Dr. Embry testified that the incisions through the tendons of the victim's wrists appeared to be post-mortem because there was no bleeding in the wounds.
Larry Huys works in the serology section of the Alabama Department of Forensic Sciences. Mr. Huys received a wrench and a knife which were taken from the impounded Bronco. He tested both for the presence of blood. It appeared that the entire wrench had a very thin coat of blood on it. The knife had type "0" blood stains on it. The victim's blood type was "0."
Mr. Huys also received from Dr. Embry vaginal swabs which were taken from the victim. Mr. Huys was asked to examine the swabs for the presence of semen and to blood type any semen found. He found semen on the vaginal swabs and identified the semen as coming from an individual with type "A" blood. The appellant has type "A" blood.
 I
The appellant initially argues that the trial court committed reversible error in failing to grant his motion for a continuance. Appellant's lead counsel, Michael Barrett, had a chronic decubitus ulcer on his right foot and felt that this would affect his performance at trial.
The record reflects that the appellant's intention of filing a motion for continuance was brought to the attention of the presiding circuit judge several weeks prior to trial. The appellant filed a motion for continuance several days before the start of the trial. The motion was accompanied by two affidavits, one prepared by himself and the other by his doctor. Defense counsel, Michael Barrett, stated in his affidavit: "It is my representation as an officer of the Court, that I am presently unable to participate in a seven (7) to ten (10) day trial beginning on October 24, 1988. I do believe that I would be able to participate effectively in a trial of only a two (2) or three (8) day duration." Barrett was sworn and testified at the motion hearing that his illness was a result of having had polio when he was a child. Barrett stated:
 "The situation is from time to time, historically, about every six to eight months, it becomes infected, for what reason we don't know, but it becomes infected. I have to take medication for three to six weeks, and then it is fine for another six months. . . . It may very well be that I could go through the trial, and it would not be a problem. It also could be that I would go two or three days into the trial and have to stop participation, or even worse than that, Your Honor, I'm afraid that I might start out strong in the trial, go for two to three to four days while the prosecution puts on its case in chief, I begin to slow down and become fatigued, have pain, run fever, and my general demeanor, or appearance, would be such that the jury, they may get the impression that I have lost heart in the case, or I am not as zealous as I was before the State began to put on its two dozen or three dozen witnesses that they are planning to call.
". . . .
 "The Court: What you are saying, there is no assurance that you won't — that you can't participate in the trial, you just don't know.
 "Mr. Barrett: That's correct, Your Honor. I cannot state to the Court that I would or would not be able to participate."
The court noted:
 "Number one, Mr. Barrett is here today, standing, talking, and doing an excellent job. Number two, there is indication from him that, you know, he could do fine in trial. Number three, even if we continue this today, there is no indication that six months from now the defendant would not be facing the exact same problem. So, we are dealing in a situation filled with possibilities. And I believe the appeals courts have held that even if we are dealing with absolutes, and Mr. Barrett were out of the picture, there is ample authority that you could go forward. I'm not sure how much in *Page 1061 
dealing with the rights of the defendant, you know, what prejudicial effect, if any, and I don't believe there is any at this point."
The court further noted that appellant's co-counsel, Mr. Fambrough, was more than qualified to represent the appellant. In fact, Mr. Fambrough had practiced law at the time of trial for over 30 years. He had been the county solicitor for 12 years and also an assistant district attorney who had worked on approximately 5 capital murder cases.
Several factors to be evaluated when considering the propriety of a continuance are the length of the continuance, the inconvenience to witnesses, counsel, and the court, and whether the "defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel." UnitedStates v. Burton, 584 F.2d 485, 490-91 (D.C. Cir. 1978), cert. denied, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979).
The decision to grant or deny a motion for continuance will not be reversed unless the trial judge has abused his discretion. See Canada v. State, 421 So.2d 140 (Ala.Cr.App. 1982); Jenkins v. State, 384 So.2d 1135 (Ala.Cr.App. 1979); cert. denied, 384 So.2d 1141 (Ala. 1980).
In Jenkins, supra, this court faced a similar issue where a continuance was requested because co-counsel could not participate in the trial due to a death in his family. In that case we noted that "there was no showing that the appellant could not be adequately represented by the remaining attorney." This court also stated that the remaining counsel adequately represented the appellant at trial.
The Georgia courts have recognized that, "If counsel who makes the motion is himself present in court, making and urging the motion in his own proper person, the judge may determine the question by the condition of counsel as it appears to him."Rawlins v. State, 124 Ga. 31, 53-55, 52 S.E. 1, 11 (1905), aff'd, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906).
As the United States Supreme Court stated: "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Ungar v. Sarafite, 376 U.S. 575, 589,84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964).
The court denied counsel's motion for a continuance for several reasons, all of which we agree with: (1) the appearance and demeanor of counsel at the motion hearing, (2) the availability of the appellant's very qualified co-counsel, and (3) the fact that counsel's illness dealt with possibilities. Six months later the court could have faced the identical problem that it faced in the present situation.
The appellant had immensely able co-counsel in Mr. Fambrough. Nothing in the record indicates that counsel was ineffective. Nor was any claim made that the jury was biased in any way.
Mr. Barrett indicated in his brief that in several instances at the end of the days, he became tired and fatigued and in some instances in pain. "All who have ever been engaged in the practice of law can appreciate that counsel very often are required to perform their duties when they are physically and mentally tired. . . ." Rawlins, 124 Ga. at 55-57,52 S.E. at 12. A review of the record shows that Barrett was not absent for any of the trial proceedings. The trial lasted five days. At no time was the trial postponed due to the illness of Mr. Barrett. Mr. Barrett stated during oral argument before this court that the appellant requested that his trial counsel continue to represent him on appeal. The trial court did not abuse its discretion in denying counsel's motion for a continuance.
 II
The appellant next argues that the trial judge erred in failing to recuse himself from the proceedings. Prior to the trial in the instant case the presiding circuit judge of St. Clair County appointed Judge Robert Austin, a district judge, to try this *Page 1062 
case. Appellant contended at trial that this appointment, provided for by Rule 13 of the Alabama Rules of Judicial Administration, violated the Alabama Constitution. He also argued that Judge Austin should have recused himself since he was at the time campaigning for a seat on the circuit court. We do not agree.
Rule 13(A), Rules of Judicial Administration, states: "The presiding circuit judge may temporarily assign circuit or district court judges to serve either within the circuit or in district courts within the circuit." Our Supreme Court has upheld the constitutionality of this Rule. See State ex rel.Locke v. Sweeney, 349 So.2d 1147 (Ala. 1977). As our Supreme Court stated in that case, the only limitation on rulemaking allowed under the Judicial Article is that rules " 'shall not abridge, enlarge or modify the substantive right of any party nor affect the jurisdiction of circuit and district courts . . .' or venue, or jury trial." Sweeney, 349 So.2d at 1148 (quoting amend. 328, § 6.11, Ala. Const. 1901). The temporary assignment of a district judge to the circuit court of the same county in no way violates this limitation. See Sweeney, id.
The appellant also argues that Judge Austin should have recused himself from the case since the election for the circuit judge position for which he was temporarily appointed was several weeks away and that fact, the appellant argues, could have affected the way he conducted the trial in the instant case.
When arguing in support of the motion, Mr. Barrett stated:
 "Of most concern, Your Honor, is in the unlikely event that a jury should convict Mr. Adkins of the crime of capital murder, and pass a recommendation of life in prison without parole, His Honor may be called upon — in a sentencing hearing to pass upon the jury's recommendation, either to accept it or reject it and impose the electric chair on Mr. Adkins."
Canon 3C, Alabama Canons of Judicial Ethics, states:
 "(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
 "(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
 "(b) He served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer in the matter, or the judge or such lawyer has been a material witness concerning it."
As this court restated in McMurphy v. State, 455 So.2d 924
(Ala.Cr.App. 1984): "The general rule in Alabama is that there is a presumption that a judge is qualified and unbiased and a person who alleges otherwise has the burden of proving that grounds for his allegation." McMurphy, 455 So.2d at 929. A reasonable man standard is used when evaluating whether a judge should recuse himself from a certain case. See United States v.Holland, 655 F.2d 44 (5th Cir. 1981). "[A] judge should disqualify himself '[w]here he has a personal bias or prejudice concerning a party. . . .' The general rule is that bias sufficient to disqualify a judge must stem from an extrajudicial source." Holland, 655 F.2d at 47. Review on appeal of a motion for recusal will not be reversed unless clear evidence of bias is shown. See Slinker v. State,344 So.2d 1264, 1268 (Ala.Cr.App. 1977).
As the United States Supreme Court stated in Aetna Life Ins.Co. v. Lavoie, 475 U.S. 813, 820, 106 S.Ct. 1580, 1585,89 L.Ed.2d 823 (1986): " 'The law will not suppose a possibility of bias or favor in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.' "
After a review of the record, we see no indication that the appellant was prejudiced in any way by Judge Austin's presiding over the trial. It would be unreasonable to hold that Judge Austin should have recused himself. This would imply that every *Page 1063 
time a judge was up for reelection or election to a different judgeship he would have to recuse himself from any publicized case directly prior to the election. To hold so here "would lead to judicial abandonment of responsibility for the purity of the judicial process and ultimately undermine the independence and integrity of the courts." United States v.Alabama, 582 F. Supp. 1197, 1208 (N.D.Ala. 1984), aff'd, 762 F.2d 1021 (11th Cir. 1985). Judge Austin committed no error in failing to recuse himself from this case.
The appellant also argued that since the trial judge denied his motion for a continuance he has shown his bias in this case. Adverse rulings are not, standing alone, sufficient to show that a judge is biased or prejudiced and should have recused himself. See Banks v. Corte, 521 So.2d 960, 962 (Ala. 1988), Matter of Sheffield, 465 So.2d 350, 357 (Ala. 1984).
 III
The appellant contends that the trial judge erred in admitting a pre-trial array of photographs which, he says, were unreasonably suggestive, thereby tainting the pre-trial and in-court identifications. More specifically, the appellant contends that the photographs which were shown to the witnesses both before and at trial contained dissimilar backgrounds. Of the six pictures in the photographic array, five of them have a smooth background. The appellant appears to be standing in front of a concrete block wall. The appellant asserts that because of this variation in the background, one's eyes automatically fall upon the appellant's photograph when viewing the photographic array.
In Ex parte Stout, 547 So.2d 901 (Ala. 1989), our Alabama Supreme Court held:
 "Pre-trial identifications are to be set aside on grounds of prejudice only if the pre-trial identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Scott v. State, 479 So.2d 1343 (Ala.Crim.App. 1985). The totality of the circumstances surrounding the out-of-court identification need be analyzed only when the pre-trial procedures used were unnecessarily or impermissibly suggestive. Coleman v. State, 487 So.2d 1380 (Ala.Crim.App. 1986)."
Stout, supra, 547 So.2d at 904.
The fact that the appellant's photo was different from the others does render it somewhat suggestive. However, after a careful scrutiny of the photographic array, we find that it is not impermissibly suggestive. On the contrary, it is a remarkably well-prepared array. All of the photographs are of white men with unkempt brown hair which is similar in length. Each of the six men has a beard and a mustache. Their eye color appears to be the same and they are wearing almost identical expressions on their faces. All six men also appear to be in the same age group and of the same build.
In addition, the manner in which the photographic array was shown to the witnesses was not impermissibly suggestive. The photographs were shown to Rebecca Farmer, Todd Farmer, Tommy Sanders, Herbert Sanders, Terry Sanders, Allison Hunter, Hank Hunter, Suzanne Chauncey, Quinn Hedrick, and Virginia Benintende. Each of these individuals was shown the array alone. Officer Jack Tucker, who prepared the array, testified that it took most of the witnesses less than one minute to select the appellant's picture. The fact that witnesses are shown photographs does not establish suggestiveness.Matthews v. State, 401 So.2d 241, 246 (Ala.Crim.App. 1981), cert. denied, 401 So.2d 248 (Ala. 1981). Thus, the out-of-court identification of the appellant was not unnecessarily or impermissibly suggestive, and there was no substantial likelihood of misidentification.
Moreover, when an in-court identification of an accused is shown to have a basis independent of any pre-trial identification, then it is correctly received into evidence.Coleman, supra, 487 So.2d at 1388; Jackson v. State,414 So.2d 1014, 1018 (Ala.Crim.App. 1982); Matthews, supra, 401 So.2d at 246. All of the witnesses who identified the appellant in court testified *Page 1064 
that he was the man they saw in January 1988. Each witness noted that the appellant looked the same except for the fact that he no longer had a beard. Some witnesses also noted a difference in the appellant's hair length. Thus, each of the in-court identifications was based on a source independent of the pre-trial line-up photographs. Since the in-court identification had a basis independent of the out-of-court identification and the out-of-court identification was not unnecessarily or impermissibly suggestive, both were correctly received into evidence.
 IV
The appellant next argues that the trial judge erred in failing to grant his motion for the State to pay for a defense witness to be brought in from Texas. The appellant made an offer of proof as to his testimony. The witness, a Texas attorney, was going to testify about the difficulty he had reaching the appellant in Georgia once he had been arrested. The following occurred:
 "Mr. Fambrough: Your Honor, we are not going to offer this. We request that the attorney from Lubbock, Texas, we be allowed to call him as a witness at the State's expense in the trial of this case.
 "The Court: I don't believe that's done. The rule is clear that on psychiatric testimony, the State must provide that sort of witness. But I don't believe that would apply to this witness. I am going to overrule that.
 "Mr. Barrett: Can I make a showing on that for the record?
"The Court: Yes.
 "Mr. Barrett: Your Honor, we have an affidavit that we would offer just for the showing of bringing him, not on the suppression hearing, which essentially the offer of proof is repeated attempts to contact the defendant in Georgia were made. These attempts were subverted by the Georgia authorities. We have tape recordings of what went on. We have sworn affidavits, telephone records of all of this. This witness is crucial as to the bearing, weight and credibility of Major Strength's testimony. We feel it critical that he be here to talk about what went on and his involvement. And we would offer his affidavit and attached record as an offer of proof showing why he should be here for trial. I'll make it clear, we are not offering this at this time in the suppression hearing, but simply to get the man here next week for the trial. It shows a pattern of conduct that was engaged in by the Georgia authorities, and also in conjunction with the Alabama authorities, I might add.
 "The Court: Really what you are asking is approval of extraordinary expense.
 "Mr. Fambrough: I don't think it is extraordinary expense. I think it is basic.
 "Mr. Davis (Prosecutor): Judge, they are also asking for that for the purpose of bringing a witness over here to impeach the credibility of one of my witnesses. It is not a material witness, and if it is not a material witness to the case to testify to a material fact as to the guilt or innocence of the defendant, then I don't think they are entitled to have him brought over here at the State's expense. Further, by their own admission, there is nothing he can do or say to affect the admissibility of whether or not this statement is admissible before a jury in this case. I suspect the reason being is all this man's contact with the Georgia authorities and all was after this statement was made. So, I say he is irrelevant and immaterial.
 "The Court: Well, as far as this hearing is concerned, they made their decision. You are saying his is an expense that attorneys for the defendant that you are going to have to incur; is that correct?
"Mr. Barrett: That's correct, Your Honor.
 "The Court: The problem there is that I don't know that there has been any showing that you are unable to produce him yourselves, or incur whatever the expenses are. There has been no showing of the necessity for this expense. There are a lot of hurdles that have to be jumped before you can, you know, authorize the State to expend sums of money in this trial preparation expense. I think *Page 1065 
that's something you have to do. I will look at it, that's all I can say."
The appellant cites cases for the proposition that the State should pay the expenses of this defense witness. However all of the cases cited by the defendant deal with the appointment of expert witnesses such as psychiatrists. There is no dispute that a defendant has a right to the appointment of an expert "where it is shown to be necessary for an adequate defense."Garth v. State, 536 So.2d 173, 177 (Ala.Cr.App. 1988). However, we know of no Alabama case which says that the State should pay the traveling expenses of a nonexpert witness.
In the instant case, Major Ronald Strength, the chief criminal investigator for Richmond County, Augusta, Georgia, stated that pursuant to a phone call received on January 18, 1988, he went to a Holiday Inn in Richmond County to pick up the appellant. Before taking the appellant to the police station, Investigator Glissen read the appellant his rights according to Miranda. After arriving at the station, the appellant was once again read his rights and signed a written waiver form. The appellant then gave a statement to Major Strength concerning the murder of Mrs. Hamilton in Alabama. The appellant gave a very disjointed statement in which he told the police that he had murdered Mrs. Hamilton, but that he could not remember exactly what happened. He also stated that he took approximately $5.00 and some credit cards from her purse. Major Strength stated that appellant then asked for an attorney, and that all questioning then ceased.
As the trial court stated, the appellant failed to show that he was unable to secure the appearance of the witness from Texas. The appellant had retained his own trial counsel, Mr. Barrett. Mr. Fambrough was appointed since, according to Alabama law, an attorney cannot be appointed to represent a defendant charged with a capital offense if he has less than five years of experience in practicing law. The appellant made no showing that he was indigent. Furthermore, the appellant has failed to show that the witness was a material witness to his case. The testimony of the witness would not affect the admissibility of the appellant's statement. Major Strength testified that once the appellant requested an attorney, the questioning ceased.
The Supreme Court of the United States in Moran v. Burbine,475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), stated that it was not
 "prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him. While such a rule might add marginally to Miranda's goal of dispelling the compulsion inherent in custodial interrogation, overriding practical considerations counsel against its adoption. As we have stressed on numerous occasions, '[o]ne of the principal advantages' of Miranda is the ease and clarity of its application. (citations omitted). . . . The legal questions it would spawn are legion: To what extent should the police be held accountable for knowing that the accused has counsel? Is it enough that someone in the station house knows, or must the interrogating officer himself know of counsel's efforts to contact the suspect? Do counsel's efforts to talk to the suspect concerning one criminal investigation trigger the obligation to inform the defendant before interrogation may proceed on a wholly separate matter? We are unwilling to modify Miranda in a manner that would so clearly undermine the decision's central 'virtue of informing police and prosecutors with specificity . . . what they may do in conducting [a] custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible.' " Moran, 475 U.S. at 425-26, 106 S.Ct. at 1143.
The appellant further argues that the denial of funds to procure the Texas witness constituted a denial of effective assistance of counsel. In order to meet the requirements necessary to show that counsel has been ineffective, the appellant must show that his counsel was deficient and that the deficiency prejudiced *Page 1066 
him. See Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Since this testimony would have had no bearing on the admissibility of the appellant's statement, the appellant has not met the requirements ofStrickland.
 V
The appellant contends that the trial court erred in admitting into evidence two different sets of photographs of the victim's body, claiming that they were duplicitous. The first set of photographs introduced was taken at the location where the body was discovered. The second set depicts the body just prior to the autopsy.
Generally, gruesome photographs of a victim's body are admissible into evidence in a criminal prosecution if they are correctly identified and authenticated and: (1) tend to shed light on, (2) strengthen, or (3) illustrate the truth of other testimony. Additionally, they are admissible if they have a reasonable tendency to prove or disprove some material fact or issue in the case. Lewis v. State, 339 So.2d 1035, 1037
(Ala.Cr.App.), cert. denied, 339 So.2d 1038 (Ala. 1976). The appellant argues that while one set of photographs could conceivably meet the Lewis test, surely the additional set is cumulative and redundant and was offered only to incite, inflame, or prejudice the jury. In fact, the appellant asserts, nothing additional is gained, other than a prejudicial effect, by offering these almost duplicate sets of photographs.
After a careful review of the record, we must disagree with the appellant's contention. The first set of photographs, depicting the location where the body was discovered, was correctly received into evidence. "The photographs were not immaterial but were illustrative and corroborative of the testimony of . . . the first policeman to arrive on the scene. . . . A photograph 'is competent evidence of anything, of which it is competent and relevant for a witness to give a verbal description.' 23 C.J.S. Criminal Law § 852(1)(a) (1961)."Harrell v. State, 470 So.2d 1303, 1306 (Ala.Cr.App. 1984), affirmed, 470 So.2d 1309 (Ala. 1985), cert. denied,474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
Likewise, the second set of photographs, depicting the body just prior to the autopsy, was correctly received into evidence. In Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987), this court held:
 " 'Photographs depicting the character and location of external wounds on the body of the deceased victim are admissible even if they constitute cumulative evidence based on an undisputed matter.' Hines v. State, 365 So.2d 320, 321 (Ala.Cr.App.), cert. denied, 365 So.2d 322
(Ala. 1978). Lovett v. State, 491 So.2d 1034, 1035
(Ala.Cr.App. 1986), cert. denied, 491 So.2d 1039
(Ala. 1986). See also C. Gamble, McElroy's Alabama Evidence § 207.01(2) (3d ed. 1977). Thus, this court has held that photographs of wounds to a deceased victim's head were admissible even where cumulative and relating to an undisputed matter. See Kinder v. State, 515 So.2d 55, (Ala.Cr.App. 1986); Scanland v. State, 473 So.2d 1182
(Ala.Cr.App. 1985), cert. denied, 474 U.S. 1035, 106 S.Ct. 602, 88 L.Ed.2d 581 (1985) Harrell v. State, 470 So.2d 1303 (Ala.Cr.App. 1984), affirmed, 470 So.2d 1309 (Ala. 1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)."
Hill, supra, 516 So.2d at 881.
Moreover, the admission of photographs in a criminal prosecution is within the sound discretion of the trial judge,Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd,494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995,107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Holland v. State, 424 So.2d 1387
(Ala.Cr.App. 1982); Washington v. State, 415 So.2d 1175
(Ala.Cr.App. 1982); Lawrence v. State, 409 So.2d 987
(Ala.Cr.App. 1982), and will be reviewed only to determine whether there has been an abuse of discretion. Updyke v. State,501 So.2d 566 (Ala.Cr.App. 1986); Barnes v. State,445 So.2d 995 (Ala.Cr.App. 1984).
 VI
Last, we address the propriety of appellant's conviction and sentence of *Page 1067 
death, as required by Beck v. State, 396 So.2d 645 (Ala. 1980), and § 18A-5-53, Code of Alabama 1975. The appellant, Ricky Dale Adkins, was indicted and convicted of three counts of capital murder as defined by § 13A-5-40(a)(1), § 13A-5-40(a)(2), and §13A-5-40(a)(3) Code of Alabama 1975.
Appellant raises no allegations and indeed we can find no evidence, that his sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. See §13A-5-53(b)(1), Code of Alabama 1975.
A review of the record reveals that the trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found that the offense was committed while the appellant was under sentence of imprisonment for a previous felony, § 13A-5-49(1), Code of Alabama 1975, and that it was committed during the course of rape, robbery, and kidnapping, § 13A-5-49(4), Code of Alabama 1975. The trial court found as a mitigating circumstance the fact that the appellant was 23 years old at the time of the offense. After considering the aggravating circumstances with the mitigating circumstance the trial court sentenced him to death.
This court's review of the aggravating circumstances and the mitigating circumstance convinces us of the propriety of appellant's sentence to death. Section 13A-5-53(b)(2), Code ofAlabama 1975.
According to § 13A-5-53(b)(3), Code of Alabama 1975, we must also address whether appellant's sentence of death was excessive or disproportionate to the penalty imposed in similar cases. Appellant's sentence was neither excessive nor disproportionate. See Bradley v. State, 494 So.2d 750
(Ala.Cr.App. 1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987);Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd,475 So.2d 609 (Ala. 1985), cert. denied, 474 U.S. 1038,106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Beck v. State, supra.
The appellant received a fair trial. Thus, his conviction and sentence are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.